In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-3474

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

PRECIOUS W. HOUSE,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 14 CR 00010 — **Andrea R. Wood**, *Judge.*

ARGUED DECEMBER 1, 2017 — DECIDED FEBRUARY 27, 2018

Before BAUER, FLAUM, and ROVNER, *Circuit Judges*.

BAUER, *Circuit Judge.* On March 19, 2015, a jury convicted defendant-appellant Precious House of six counts of bank fraud, in violation of 18 U.S.C. § 1344, as a result of his involvement in a fraudulent automobile loan scheme. At sentencing, the district court determined the appropriate Sentencing Guidelines range was 108 to 135 months' imprisonment, and

sentenced House to serve 108 months. House appeals from that sentence, arguing that the district court improperly applied a three-level enhancement by finding that House was a manager or supervisor of the scheme, pursuant to § 3B1.1(b) of the Sentencing Guidelines. We affirm.

## I. BACKGROUND

From approximately February to December 2013, House and his co-defendants participated in a scheme to secure automobile loans—and retain a percentage of the pro-ceeds—by falsifying income and vehicle information for individuals who were seeking personal loans.

House owned a wholesale car dealership called Rolling Auto. In September 2012, he approached co-defendant Crystal Williams, who was working for a lending consulting company at the time, and proposed a plan in which they would seek loans by falsely stating that Rolling Auto intended to sell cars to loan applicants. He picked an unreliable partner; Williams entered into a plea agreement with the government and provided the core testimony at trial against House and co-defendants Brian Hughes and Murchael Turner. She testified that, as part of the scheme, she prepared loan applications for 19 different borrowers, none of whom would actually purchase a vehicle from Rolling Auto. On those loan applications, Williams falsified details such as registration fees, balances due, taxes owed, and the names of salespersons. House provided her with the details of vehicles she could use on false purchase orders that would correspond with the amounts sought by the borrowers. Specifically, House supplied her with the make, model, color, year, vehicle identification numbers,

mileage, and price for vehicles that neither he nor Rolling Auto owned.

Williams would ensure that the loan checks were made payable to Rolling Auto, and instructed the borrowers to send the loan checks to Rolling Auto's address. In some cases, House deposited the checks in Rolling Auto's business checking account at TCF Bank, retaining a certain percentage of the funds, and distributed the remainder to Williams and the borrower, based on the amounts Williams provided. In other cases, House cashed the checks at a currency exchange before retaining his percentage and distributing the remainder. House signed the checks in his role as owner of Rolling Auto.

In March 2013, TCF returned one of the checks House had deposited, which caused the Rolling Auto business account to go into the negative. Williams anticipated that the bank might close the account as a result, so she suggested that they open another account with Bank of America. House provided her with Rolling Auto's employer identification number and other information, and she opened a new account in Rolling Auto's name. House continued to deposit checks into that account and distribute the funds as he had done previously.

In July 2013, credit unions began denying loans to Rolling Auto. In response, Williams proposed creating a new business to use as a front for the car loans. Williams drafted articles of incorporation, which she sent to House for review, for a company called Xpress Automotives; the business was not operational, nor did it own a car lot or any cars. After Williams filed the paperwork, House used Xpress Automotives to apply for and receive nine additional loan checks.

House was personally involved in applying for 51 loans to credit unions for fictitious auto sales in 2013. Thirty-six of those were approved, resulting in total loan proceeds of $1.1 million. House personally kept $105,589.96 of that money, which was the most in relation to his co-defendants. Williams took approximately $60,000, Hughes took approximately $68,000, and Turner approximately $2,500.

On March 19, 2015, a jury found House guilty of all six counts of bank fraud against him. Prior to his sentencing, the United States Probation Office filed a Presentence Investigation Report (PSR), which recommended a total offense level of 31, combined with a criminal history category of II, to reach a Sentencing Guidelines range of 121 to 151 months' imprisonment. As part of its calculation, the PSR included a four-level enhancement for being the organizer or leader of criminal activity, pursuant to § 3B1.1(a) of the Sentencing Guidelines.

House and the government each filed a sentencing memorandum in response to the PSR. The government recommended a three-level enhancement for being a manager or supervisor, pursuant to § 3B1.1(b). Among his other objections, House contended that no enhancement under that section was warranted, as there was no hierarchy among the participants, and everyone played an equal role.

The district court held a sentencing hearing on August 10, 2015. As to the arguments regarding the § 3B1.1 enhancement, the court found that the co-defendants had distinct roles in the scheme. It found that House was involved in the planning of the scheme, particularly with the idea to use fictitious car sales as a front for obtaining the loans. The court noted that House

used his business, Rolling Auto, as the cover, which meant that he was necessarily involved in the key aspects of planning the scheme. It also highlighted the fact that House earned the most money and touched the highest number of transactions of all the co-defendants. The court acknowledged that House did not recruit participants to the same extent as the others, but the totality of his conduct qualified him for the three-level enhancement for being a manager or supervisor of the scheme.

The court accepted the remainder of the PSR's recommendations and calculated a total offense level of 30, resulting in a Sentencing Guidelines range of 108 to 131 months. After evaluating the requisite factors under 18 U.S.C. § 3553(a), the court sentenced House to 108 months' imprisonment. House timely appealed.

## II. DISCUSSION

When considering a challenge to an enhancement under § 3B1.1 of the Sentencing Guidelines, we review the district court's factual determinations for clear error, and we review whether those facts support the enhancement *de novo*. *United States v. Harris*, 791 F.3d 772, 780 (7th Cir. 2015) (citations omitted). "We reverse a district court's application of a Guidelines enhancement only if we are left with a 'definite and firm conviction that a mistake has been made.'" *Id.* (quoting *United States v. Johnson*, 489 F.3d 794, 796 (7th Cir. 2007)).

Sentencing Guidelines § 3B1.1 provides for enhancements based on a defendant's role in his offense. Where a crime involves five or more participants "or is otherwise extensive," a defendant receives a four-level enhancement if he is an "organizer or leader" of the scheme, and a three-level enhance-

ment if he is a "manager or supervisor." U.S.S.G. § 3B1.1(a) and (b). House concedes that his crime involved five or more participants or was "otherwise extensive." He argues only that he should not have received a three-level enhancement because his involvement did not rise to the level of a manager or supervisor.

The Sentencing Guidelines do not directly define the terms organizer, leader, manager, or supervisor. The Application Notes, however, provide a list of factors for courts to use "[i]n distinguishing a leadership and organizational role from one of mere management or supervision." *Id.* § 3B1.1 cmt. n.4. Those factors include the exercise of decision making authority, the nature of the defendant's participation, the recruitment of accomplices, the share of the fruits of the crime, the degree of participation in planning or organizing, the nature and scope of the crime, and the degree of control or authority exercised over others. *Id.* While those factors were clearly meant to draw contrasts between the categories in subsections (a) and (b), they have also been used in determining whether § 3B1.1 applies at all. *See United States v. Bennett*, 708 F.3d 879, 891 (7th Cir. 2013) (collecting cases). In *United State v. Figueroa*, however, we found that the factors may be unhelpful in determining whether the three-level manager/supervisor enhancement applied. 682 F.3d 694, 697 (7th Cir. 2012) ("If a judge … doesn't know what a 'manager' or 'supervisor' is, Application Note 4 isn't going to help him—especially since it's about organizers and leaders and *not* middle managers and low-level supervisors.").

As a result of these differing views regarding the helpfulness and applicability of the Note 4 factors, we have shifted

our focus to a more practical analysis and explained that "a manager or supervisor should be straightforwardly understood as simply someone who helps manage or supervise a criminal scheme." *United States v. Grigsby*, 692 F.3d 778, 790 (7th Cir. 2012) (citing *Figueroa*, 682 F.3d at 697-98). Recently, we affirmed that the primary goal in applying § 3B1.1 should be to make a "commonsense judgment about the defendant's relative culpability given his status in the criminal hierarchy." *United States v. Dade*, 787 F.3d 1165, 1167 (7th Cir. 2015) (quoting *United States v. Weaver*, 716 F.3d 439, 443 (7th Cir. 2013)).

That does not mean, however, that the factors are to be disregarded completely. Indeed, the district court found them helpful to its analysis in this case. "To the extent those factors help to straightforwardly identify whether a defendant helps manage or supervise a criminal scheme, courts may continue to consider them." *Weaver*, 716 F.3d at 443 (internal quotation marks omitted). Still, we must bear in mind that none of the factors, individually, is a prerequisite to the application of a § 3B1.1 enhancement. *Id.*; *see also Bennett*, 708 F.3d at 891 (explaining that "slavish adherence to [the factors] is unnecessary: the ultimate question is what relative role the defendant played") (internal quotation marks and citation omitted).

With that as the operative framework, we find no error in the district court's application of the three-level enhancement. The facts the court cited at the sentencing hearing support the "straightforward" conclusion that House "help[ed] manage or supervise the criminal scheme." *Weaver*, 716 F.3d at 443. House used his own business as the cover for obtaining the loans and was instrumental in the design of the overall scheme. He

provided the necessary (albeit, falsified) vehicle information used to secure the loans. He was also integral in the distribution of proceeds to the scheme's participants, including the borrowers, and he retained a significantly greater amount of those funds than anyone else involved. Given that the court was tasked with making a "commonsense judgment about [House's] relative culpability," there was no error in its determination that House had a managerial or supervisory role. *See Dade*, 787 F.3d at 1167.

House's main contention on appeal is that without an explicit finding that he exercised direct control or authority over another participant, the § 3B1.1 enhancement cannot apply. To support that argument, he cites a number of our opinions that have suggested the enhancement requires such a finding. *See United States v. Gracia*, 272 F.3d 866, 877 (7th Cir. 2001) ("All factors need not be present, but the defendant must have 'exercised some control over others involved in the offense.'") (quoting *United States v. Pagan*, 196 F.3d 884, 892 (7th Cir. 2000)); *see also United States v. Fones*, 51 F.3d 663, 670 (7th Cir. 1995) (holding that the enhancement did not apply where the district court found defendant did not have control over any other participants).

In *Dade*, however, we clarified that application of § 3B1.1 is not limited in that way, and that control is simply one measure. 787 F.3d at 1167. "In addition to exercising control, a defendant also fits into one of § 3B1.1's aggravating roles if he was responsible for organizing others for the purpose of carrying out the crime." *Id.* (internal quotation marks and citations omitted). House's role in devising the plan, using his business as the front, providing the necessary vehicle information,

coordinating with his co-conspirators and the borrowers, and receiving and distributing the funds meets that standard. All of those actions required organizational efforts sufficient to satisfy § 3B1.1(b)'s threshold.

### III. CONCLUSION

For the foregoing reasons, the district court's sentence is AFFIRMED.