In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 20-2463

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHRISTIAN M. LOVIES,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:17-cr-254-JRS-MJD — **James R. Sweeney II**, *Judge.*

_____

ARGUED SEPTEMBER 15, 2021 — DECIDED OCTOBER 21, 2021

_____

Before BRENNAN, SCUDDER, and ST. EVE, *Circuit Judges.*

BRENNAN, *Circuit Judge.* Christian Lovies, wielding a gun, stole Emily Butler's car as she was filling it with gasoline. Along with three other individuals, including a minor, Lovies kidnapped Butler and took her from Indianapolis to Cincinnati while threatening to kill her.

A federal grand jury indicted Lovies for kidnapping, carjacking, and brandishing a firearm during and in relation

to a crime of violence. After a trial, a jury found Lovies guilty on all counts, and the district judge sentenced him to an imprisonment term within the applicable Sentencing Guidelines range. Lovies appeals his conviction, arguing the district court improperly denied a *Batson* challenge he raised during jury selection. He also contends the trial court erred in applying two sentencing enhancements: one for use of a minor to commit the offense, and one for his role in the offense.

In rejecting Lovies's *Batson* challenge, the district court found the prosecutors credible and their explanation for exercising the challenged peremptory strike to be plausible. We owe great deference to the district court's credibility determinations, and we cannot say its factual findings were clearly erroneous, so we affirm the denial of Lovies's *Batson* challenge and his conviction. The district court's factual findings were also adequate to support the application of the two sentencing enhancements, and any error with respect to the calculation of Lovies's Guidelines range would be harmless. We therefore affirm Lovies's sentence as well.

## I.

### A. Factual Background

On April 27, 2017, Lovies and Jaleel Schultz stole a car that someone had left running outside a restaurant in Milwaukee. They discovered a toddler inside the vehicle and abandoned the child at an intersection. Shortly thereafter, they crashed and totaled the vehicle.

Fearing authorities were closing in to arrest him for the vehicle theft, Lovies recruited his friend, Armone Hudson, to leave the city with him. Lovies, Hudson, Schultz, and

Schultz's minor girlfriend, L.M., met up to leave Milwaukee on May 1, 2017.

Lacking adequate transportation, the group relied on Lovies to provide it. He and L.M. located an Infiniti sport utility vehicle that had been left running in a parking lot and stole it. Lovies and L.M. then picked up Hudson and Schultz, and the group began its journey. Inside the Infiniti, Lovies discovered a firearm, which he kept.

As the group drove through Indianapolis, the Infiniti broke down. They eventually arrived at a hotel, where they tried to rent a room under L.M.'s name, but they were unsuccessful because she did not have her driver's license. So they walked to a gas station, where they split up: Lovies went with L.M., and Hudson went with Schultz.

There, Lovies and L.M. approached Emily Butler at a gas pump. Lovies, brandishing the gun he had stolen from the Infiniti, demanded and took Butler's car keys and entered the driver's seat of her car. L.M. ensured Butler remained near the car and then pushed her in the back, taking her hostage.

The group then drove toward Cincinnati, a destination Schultz suggested, in Butler's car. Lovies and L.M. discussed killing Butler, but Hudson objected. Butler began crying because she believed Lovies and L.M. planned to kill her, but Hudson prevailed. After the group reached Cincinnati, Hudson released Butler, who drove away in her car. Law-enforcement agents later apprehended Lovies, L.M., Schultz, and Hudson.

## B. Procedural History

Lovies, Schultz, and Hudson were charged for the kidnapping and carjacking of Butler in violation of 18 U.S.C.

§ 1201(a) and 18 U.S.C. § 2119, respectively. The government also charged Lovies under 18 U.S.C. § 924(c)(1)(A) with brandishing a firearm during and in relation to a crime of violence. Schultz and Hudson pleaded guilty, and Lovies proceeded to trial.

During jury selection, the government moved to strike Juror No. 9 for cause, stating he "ke[pt] falling asleep" and "ke[pt] nodding off." The trial judge denied the government's motion, instead encouraging the attorneys to speed up their questioning to avoid putting the prospective jurors to sleep. Later, the government exercised a peremptory strike to remove Juror No. 9 from the jury pool. Lovies raised a *Batson* challenge to this peremptory strike, arguing the government engaged in racial discrimination when it struck Juror No. 9, whom Lovies noted was "a black gentleman" who "didn't say a word the whole time we were here."

After hearing the parties' arguments, the district court decided that Lovies had failed to make a prima facie case of discrimination at *Batson*'s first step. The court found that the government's contention that Juror No. 9 was falling asleep was a race-neutral reason for the peremptory strike. Further, the court stated, it would have overruled the *Batson* challenge even if Lovies had made a prima facie case because the "demeanor of the prosecutors" indicated they were not engaged in purposeful discrimination.

At trial, Hudson and Butler testified about the kidnapping and carjacking. The government also introduced video evidence of Lovies and L.M. kidnapping and carjacking Butler. After a two-day trial, the jury convicted Lovies on all three counts.

The presentence investigation report yielded a Guidelines imprisonment range for Counts One and Two, the kidnapping and carjacking charges, of 292 to 365 months. For Count Three, the gun charge, the Guidelines sentence was the mandatory-minimum sentence of 84 months, which was required to run consecutive to the sentences imposed on the first two counts.

At sentencing Lovies objected to the two-level enhancement for use of a minor under U.S.S.G. § 3B1.4. Neither Schultz nor Hudson received the enhancement, and Lovies contended Schultz was the one who brought L.M. to the group and that she acted as an equal partner during the crime spree. Lovies also objected to the application of a two-level enhancement for being an organizer, leader, manager, or supervisor of criminal activity under U.S.S.G. § 3B1.1(c), asserting he played no greater role in the crime spree than any other group member and challenging the quantum of evidence as to how long he possessed the firearm and whether he threatened to kill Butler.

The district court overruled both of Lovies's objections. First, the court found by a preponderance of the evidence that Lovies at least partnered with L.M. to commit the carjacking and kidnapping of Butler, so the use-of-a-minor sentencing enhancement was proper. Second, the court found by a preponderance of the evidence that Lovies was an organizer, leader, manager, or supervisor of a "loose organization" engaged in criminal activity.

Next, the court calculated Lovies's offense level to include a two-level enhancement for use of a minor and a two-level enhancement for his role in the offense. Lovies was sentenced to 304 months' imprisonment on Counts One and Two and 84

months' imprisonment on Count Three, which resulted in an aggregate sentence of 388 months. Lovies timely appealed.

**II.**

On appeal, Lovies first argues the district court erred in denying his *Batson* challenge. To prevail on his *Batson* claim, Lovies must show the government had a racially discriminatory intent in exercising its peremptory strike to remove Juror No. 9. *See United States v. Cruse*, 805 F.3d 795, 806 (7th Cir. 2015).

There are three steps to a *Batson* challenge. First, a challenger must make a prima facie case that the peremptory strike was racially motivated. *Id.* (citing *Snyder v. Louisiana*, 552 U.S. 472, 476 (2008)). The challenger's burden at this step is low, requiring "only circumstances raising a suspicion that discrimination occurred." *Id.* at 807 (quoting *United States v. Stephens*, 421 F.3d 503, 512 (7th Cir. 2005) ("*Stephens I*")). To meet this burden at the first step, however, the strike's opponent cannot merely point to the stricken juror's race. *See United States v. McMath*, 559 F.3d 657, 664 (7th Cir. 2009) (citing *Anderson v. Cowan*, 227 F.3d 893, 901–02 (7th Cir. 2000)). One way for the challenger to meet this burden involves comparing the stricken black juror to the non-stricken white juror and showing that nothing differentiated the prospective jurors except for race. *See id.* at 664–65 (citations omitted).

The second *Batson* step requires only that the explanation offered in defense of the strike be non-discriminatory. *United States v. Stephens*, 514 F.3d 703, 710 (7th Cir. 2008) ("*Stephens II*") (citing *Purkett v. Elem*, 514 U.S. 765, 767–68 (1995)). The persuasiveness of the proponent's justification for the peremptory strike is not relevant at the second step. *See id.*

At the third and final step, the trial court must determine "whether the opponent of the strike has carried his burden of proving purposeful discrimination." *Cruse*, 805 F.3d at 807 (quoting *Johnson v. California*, 545 U.S. 162, 171 (2005)). "The relevant question during the third step of the *Batson* inquiry is whether a strike was racially motivated. It follows that *Batson* and its progeny direct trial judges to assess the *honesty*—not the accuracy—of a proffered race-neutral explanation." *Id.* at 808 (quoting *Lamon v. Boatwright*, 467 F.3d 1097, 1101 (7th Cir. 2006)).

The trial court may consider all relevant circumstances when assessing the honesty of a proffered explanation for a peremptory strike, including interpreting the demeanor of the attorney who initiates the strike and evaluating the explanation's plausibility with reference to its basis in "accepted trial strategy." *See id.* at 807; *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003). The court may employ one or some of several possible methods to make credibility determinations. *See United States v. Rutledge*, 648 F.3d 555, 558 (7th Cir. 2011).

We review a district court's *Batson* findings for clear error. *Cruse*, 805 F.3d at 806. "Deference is necessary because a reviewing court, which analyzes only the transcripts from voir dire, is not as well positioned as the trial court to make credibility determinations." *Rutledge*, 648 F.3d at 558 (quoting *Miller-El*, 537 U.S. at 339). Thus, we will affirm unless "we arrive at a definite and firm conviction that a mistake has been made." *Cruse*, 805 F.3d at 806 (quoting *McMath*, 559 F.3d at 670). Our review is "highly deferential." *United States v. Hunter*, 932 F.3d 610, 617 (7th Cir. 2019) (quoting *Flowers v. Mississippi*, 139 S. Ct. 2228, 2244 (2019)).

### A.  Step Three

We begin with step three because, in our review, that is where the district court primarily rested its decision denying Lovies's *Batson* challenge.

Step three, at which the trial court weighs the evidence and determines whether the strike's opponent has proved purposeful discrimination, is "the heart of the matter." *Cruse*, 805 F.3d at 807. We review a finding that a peremptory strike's proponent is credible for clear error, and we defer greatly to the district court's credibility determinations. *See Morgan v. City of Chicago*, 822 F.3d 317, 327 (7th Cir. 2016) (citing *Hernandez v. New York*, 500 U.S. 352, 364–65 (1991)); *accord United States v. Taylor*, 509 F.3d 839, 845 (7th Cir. 2007) ("Only the district judge, who observed the voir dire firsthand, can make [the credibility] determination in the first instance.").

Under this standard of review, we cannot say the district court's finding—that the prosecutors were credible in their belief that Juror No. 9 was either falling asleep or at least disinterested in the proceedings—was clearly erroneous. "[I]t is the district court's job, not ours, to weigh the credibility of the government's reason for the peremptory challenge and decide whether the defendant[] met [his] burden of establishing discrimination." *Taylor*, 509 F.3d at 845. The trial court observed the voir dire and expressly found that the prosecutors' demeanor showed they were credible. The court also concluded that the prosecutor's reasoning for the strike was race neutral and suggested that reasoning was plausible. Because the trial court's finding was consistent with the record, it was sufficient to resolve the *Batson* challenge at step three.

Two significant considerations support the district court's credibility determination. First, the district judge implied he believed Juror No. 9 was falling asleep during the proceedings, which denotes the absence of purposeful discrimination on the government's part. Although Lovies argues otherwise, the district judge did not reject the government's assertions that Juror No. 9 was falling asleep during the proceedings.

In its ruling, the trial judge said, "[The government] raised the concern that [Juror No. 9] was falling asleep. They wanted it to be a cause. I didn't allow that just because I thought I could keep him awake[.]" In context, the judge's statement—that he only denied the government's request to strike Juror No. 9 for cause because he believed he could hold Juror No. 9's attention—suggests he credited the prosecutors' assertion that Juror No. 9 was falling asleep as the attorneys conducted jury-selection proceedings. This is so even though the trial judge did not personally observe Juror No. 9 asleep.

Precedent likewise forecloses Lovies's argument on this point. Our decision in *United States v. Jones*, 224 F.3d 621 (7th Cir. 2000), holds that we will not reject the explanation of a juror's drowsiness as a pretext for a discriminatory strike merely because the district judge did not observe the juror asleep. *See id*. at 624–25. Lovies argues this case differs from *Jones* because here the court did not allow the government to strike Juror No. 9 for cause when the government asserted—at that stage—Juror No. 9 was falling asleep. But the judge did not reject the government's assertions of Juror No. 9's drowsiness; rather, he said he thought he could keep Juror No. 9 awake. Thus, the judge cast no doubt on the prosecutors' explanation for the peremptory strike. And we

must defer to the district court's factual findings where the record does not contradict them.

A trial judge's firsthand observations of a juror's demeanor are important where a peremptory strike's proponent refers to that demeanor. But a judge need not personally observe the juror's demeanor to uphold the peremptory strike against a *Batson* challenge. In *Thaler v. Haynes*, the Supreme Court clarified that a trial judge may accept a prosecutor's demeanor-based explanation for striking a juror even where the judge does not personally recall the prospective juror's demeanor. *See* 559 U.S. 43, 47–49 (2010). Thus, the trial judge did not commit reversible error in rejecting the *Batson* challenge at step three without personally observing Juror No. 9's drowsiness.

Second, even if the district judge did not believe Juror No. 9 was falling asleep during jury selection, the judge specifically evaluated the prosecutors' credibility and found them credible in their belief that Juror No. 9 was at least disinterested in the proceedings, if not falling asleep. The trial judge stated, "I certainly have seen the demeanor of the prosecutors, and I don't think that there's purposeful discrimination here. They seem earnest in their belief that he's disinterested."

From his firsthand vantage point, the district judge was in the best position to make the determination that the prosecutors were sincere. We accord the district judge's credibility determination great deference on appeal. *See Morgan*, 822 F.3d at 327; *Hernandez*, 500 U.S. at 364–65. Here, the judge observed the proceedings and the attorneys, and he found the prosecutors' explanation for striking Juror No. 9 to be honest. *See Cruse*, 805 F.3d at 808; *Lamon*, 467 F.3d at 1101.

Reviewing these voir dire transcripts, we have no basis on which to question the district court's credibility determination.

Lovies asks us to rely on *McMath*, where this court remanded for the district court to make further findings on the *Batson* issue. *See* 559 F.3d at 666. But in that case, the district court had made "no evaluation of the prosecutor's credibility." *Id*. Here, the district court made credibility findings on the record, so we affirm.

Lovies also raises new arguments on appeal comparing Juror No. 9 with non-stricken white jurors. But Lovies forfeited these juror-comparison arguments by not presenting them to the district court. Even if we were to determine that they were not forfeited, we would still conclude that the record is insufficient to permit us to determine the non-stricken white jurors were comparable to Juror No. 9.

During jury selection, "[i]t is the defendant's burden to raise specific arguments that the government's justification [for a peremptory strike] was pretextual so that the court can properly address them." *United States v. Brown*, 809 F.3d 371, 374 (7th Cir. 2016). In *Brown*, we left open the question of whether a "similarly situated" argument regarding prospective jurors is forfeited where the defendant fails to raise it before the trial court. *See id*. at 374 n.1. When a defendant does not properly raise challenges based on prospective jurors' purported shared characteristics, the appellate court "loses the benefit" of the trial judge's firsthand evaluation of prospective jurors. *United States v. Gooch*, 665 F.3d 1318, 1331 (D.C. Cir. 2012) (citing *Snyder*, 552 U.S. at 477). Thus, to permit thorough appellate review, "similarly situated" arguments should be raised before trial courts,

affording them the opportunity to address any juror-comparison issues the defendant identifies.

Other circuits have held that where a defendant fails to argue for comparative juror analysis at trial, the appellate court need not conduct such an analysis. *See United States v. Gibson*, 105 F.3d 1229, 1232 (8th Cir. 1997) ("[A] 'similarly situated' argument is untimely and cannot be made if it is raised for the first time on appeal rather than at the trial level."); *Gooch*, 665 F.3d at 1330–32 (holding unpreserved "similarly situated" arguments are reviewed only for plain error); *United States v. Mahbub*, 818 F.3d 213, 229 (6th Cir. 2016) ("[O]ur case law explains that this court is by no means compelled to conduct a comparative juror analysis when a defendant failed to preserve the issue."). We do not decide today whether a "similarly situated" argument is subject to review on appeal, or if it may be reviewed only for plain error. Rather, we just conclude that Lovies's juror-comparison argument is unconvincing.

Even if Lovies's juror-comparison arguments were considered on their merits, we would bear in mind the Supreme Court's admonition that "a retrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were not raised at trial." *Snyder*, 552 U.S. at 483.

Given the limited scope of our review in this context, we cannot determine that the non-stricken white jurors were similar to Juror No. 9. Lovies argues the prospective jurors at issue are similar because—like Juror No. 9—several of the non-stricken white jurors also failed to give verbal responses to questions on the record. But prospective jurors can demonstrate their attentiveness through non-verbal means.

The district court presided over jury selection and is best positioned to determine whether prospective jurors are similar. The court did not find the non-stricken white jurors in the venire panel to be similar to Juror No. 9. So the record is insufficient to reach the conclusion Lovies advances.

Lovies also takes issue with what he describes as a "quota-like assertion" by the prosecutor. One of the prosecutors told the trial judge, "[w]e left other African Americans on the panel, and striking one African American is not sufficient to make out the prima facie case versus *Batson*." To Lovies, this statement demonstrated a discriminatory intent, strengthening Lovies's *Batson* challenge. But the prosecutor's statement lacks the discriminatory significance Lovies suggests. We have noted that the ultimate racial composition of a jury is relevant to a *Batson* challenge, although it is not dispositive. *See Cruse*, 805 F.3d at 808–09; *Morgan*, 822 F.3d at 336–37. The prosecutor's comment that a black juror remained on the panel was therefore relevant and not indicative of a prejudicial motive.

The third step resolves Lovies's *Batson* challenge in the government's favor because the district court found the prosecutors to be credible. Reviewing the record, we lack any basis on which to second-guess that credibility finding.

## B. Step One

We next discuss step one, on which the district court also ruled. Lovies argues step one, the prima facie case, is moot in this case because the trial court ruled that Lovies failed to demonstrate intentional discrimination at the third *Batson* step. "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court

has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez*, 500 U.S. at 359; *see also McMath*, 559 F.3d at 664; *United States v. White*, 582 F.3d 787, 801 (7th Cir. 2009).

We agree. The district court ruled here on the ultimate question of purposeful discrimination. Relying on the prosecutors' demeanor and the plausibility of their explanation for the challenged peremptory strike, the district court found there was no purposeful discrimination. Thus, *Batson* step one is technically moot in this case. At the same time, we take this opportunity to emphasize that it was proper for the district court to consider step one and to make a finding on it.

Lovies does not contest the district court's finding at step two that the government had offered a race-neutral reason for its strike, instead arguing the government's explanation— Juror No. 9's demeanor—was invalid.

### C. *Batson* Procedure

We encourage district courts to follow each of *Batson*'s three steps in sequence and to develop a comprehensive record as to each step. The Supreme Court has designed the three *Batson* steps as a bulwark to protect against racial discrimination. *See generally Johnson v. California*, 545 U.S. at 172–73. By methodically working through each step of a *Batson* challenge, and not collapsing them into a single inquiry, a crystal-clear record is developed for the benefit of

all, including to facilitate appellate review. *See Rutledge*, 648 F.3d at 559–60.

When faced with a *Batson* challenge, a district court should first consider whether the challenger has presented evidence that is sufficient to permit an inference of racial discrimination. If the court concludes the challenger has not presented such evidence, the *Batson* challenge should be rejected at step one. But a district court need not pronounce its ruling on step one before the *Batson* inquiry proceeds to the next two steps.

Rather, typically the better course will be for the district court to "delineate each of the steps explicitly, reserving judgment on the challenge until all of the steps have been performed." *United States v. Cecil*, 615 F.3d 678, 687 n.3 (6th Cir. 2010). A trial court may choose to terminate the *Batson* inquiry at either step one or step two—if it concludes the challenger or proponent, respectively, failed to meet the applicable burden at either of those steps—but it is not obligated to do so. Instead, the district court may hear argument from each party on each step, take the parties' submissions under advisement while proceeding to the subsequent steps, and then issue its rulings with respect to each step after it has heard each party's position on all *Batson*-related issues. *See id.*

Where the trial court proceeds to *Batson* step two, it should state on the record whether it believes the peremptory strike's proponent has articulated a race-neutral reason for striking the prospective juror at issue. At this stage, the district court should bear in mind that step two sets a low bar for the strike's proponent to clear. *See Stephens II*, 514 F.3d at 710; *Purkett*, 514 U.S. at 768.

At step three, the district court should state its finding as to whether the challenger has shown the proponent's peremptory strike was motivated by racial discrimination. Like the district court did here, explicit findings should be made on the record about the credibility of the strike's proponent if the proponent's credibility is important to the district court's *Batson* analysis.

### III.

In addition to the resolution of his *Batson* challenge, Lovies disputes the district court's calculation of his offense level and thus the applicable range of imprisonment under the Sentencing Guidelines. First, he contends the evidence that he directed L.M. or partnered with her to commit the charged offenses was insufficient to permit the application of a sentencing enhancement for use of a minor to commit the offense under U.S.S.G. § 3B1.4. Second, Lovies argues the district court should not have imposed a two-level enhancement under U.S.S.G. § 3B1.1(c) for his role in the offense because the group's members were coequals. The enhancement applies where a defendant was "an organizer, leader, manager, or supervisor" of criminal activity involving fewer than five participants. U.S.S.G. § 3B1.1(c).

We review whether a district court's factual determinations adequately support a sentencing enhancement's application de novo, but we review those factual determinations for clear error. *United States v. Hodges*, 315 F.3d 794, 801 (7th Cir. 2003); *see also United States v. House*, 883 F.3d 720, 723 (7th Cir. 2018) (citation omitted). "We reverse a district court's application of a Guidelines enhancement only if we are left with a definite and firm

conviction that a mistake has been made." *House*, 883 F.3d at 723 (internal quotation marks and citations omitted).

### A. Sentencing Enhancement for Use of a Minor

U.S.S.G. § 3B1.4 provides for a two-level increase in the defendant's offense level "[i]f the defendant used or attempted to use a person less than eighteen years of age to commit the offense or assist in avoiding detection of, or apprehension for, the offense." Application Note 1 to U.S.S.G. § 3B1.4 clarifies that "'[u]sed or attempted to use' includes directing, commanding, encouraging, intimidating, counseling, training, procuring, recruiting, or soliciting."

Under our case law, a defendant "who partners with a minor will be found to have used that minor to commit his crime in the sense contemplated by Section 3B1.4." *United States v. Ramsey*, 237 F.3d 853, 859 (7th Cir. 2001) (citing *United States v. Benjamin*, 116 F.3d 1204, 1206 (7th Cir. 1997)). "By forming a partnership with a minor, a criminal defendant is undeniably encouraging that minor to commit a crime." *Id.*

Lovies attempts to distinguish *Ramsey* by contending the defendant there recruited the minor himself, whereas Lovies did not actively recruit L.M. to the group. But that distinction does not affect whether Lovies partnered with L.M. in committing the carjacking and kidnapping of Butler. We must resolve whether the district court's decision that Lovies partnered with L.M. to carjack and kidnap Butler was clearly erroneous.

We look first to the record. At sentencing the district court relied on trial testimony and video evidence that L.M. acted alongside Lovies as he took Butler's keys and she pushed Butler into the car, rendering Butler a hostage. Lovies argues

the district court improperly relied on his mere physical proximity to L.M. during the kidnapping, but the video evidence and trial testimony showed that Lovies and L.M. committed the carjacking and kidnapping together.

Despite Lovies's arguments to the contrary, § 3B1.4 does not require a defendant to provide any specific direction to the minor to encourage the minor's participation in the offense. Even if L.M. was a "voluntary participant" in the carjacking and kidnapping of Butler, as Lovies contends, her voluntary participation does not negate evidence of a partnership between Lovies and L.M. *See Ramsey*, 237 F.3d at 859. Lovies partnered with L.M. when he brandished the gun at Butler and took her keys while L.M. kept Butler close to her car and pushed her into the back. Lovies encouraged L.M. to commit the crimes of carjacking and kidnapping, and the district court's findings were therefore sufficient to support the two-level enhancement. So, the record supports only one conclusion: the district court's factual findings on the § 3B1.4 enhancement were not clearly erroneous and Lovies partnered with L.M.

We have also considered Lovies's arguments that the district court created an unwarranted sentencing disparity when it applied the § 3B1.4 enhancement to Lovies but not to his codefendants. According to Lovies, the district court violated 18 U.S.C. § 3553(a)(6) and *United States v. Cunningham*, 429 F.3d 673 (7th Cir. 2005), by failing to sufficiently explain the reasons for the disparity.

Assuming without deciding that Lovies did not waive these arguments by failing to include them in his opening brief, we cannot adopt his position. The district court imposed a within-Guidelines sentence, which necessarily accounts for

concerns of unwarranted sentencing disparities. *See United States v. Sanchez*, 989 F.3d 523, 540–41 (7th Cir. 2021) (citations omitted). Additionally, the district judge considered and rejected Lovies's argument that he was equally culpable relative to his codefendants. Thus, there was no violation of either § 3553(a)(6) or *Cunningham*.

## B. Sentencing Enhancement for Role in the Offense

Lovies also contends the district court committed reversible error when it applied a two-level increase for his aggravating role in the offense. "If the defendant was an organizer, leader, manager, or supervisor" in criminal activity involving fewer than five participants, his offense level is increased by two levels. U.S.S.G. § 3B1.1(c). To qualify for this enhancement, the defendant "must have been the organizer, leader, manager, or supervisor of one or more other participants." *Id*. cmt. n. 2.

First, Lovies argues the district court committed legal error by determining that the role enhancement could apply to a member of an *ad hoc*, loosely organized group engaged in criminal activity. Lovies seeks to cabin the enhancement's application to defendants who had clearly defined roles in organized criminal conspiracies. But we disagree with this interpretation as our case law is to the contrary.

The test for whether a defendant is a manager or supervisor in a criminal organization under § 3B1.1 is practical, not formal. A manager or supervisor "should be straightforwardly understood as simply someone who helps manage or supervise a criminal scheme." *House*, 883 F.3d at 724 (quoting *United States v. Grigsby*, 692 F.3d 778, 790 (7th Cir. 2012)). Where there is a dispute about whether the role

enhancement applies to a defendant, the court should make a "commonsense judgment about the defendant's relative culpability given his status in the criminal hierarchy." *United States v. Dade*, 787 F.3d 1165, 1167 (7th Cir. 2015) (quoting *United States v. Weaver*, 716 F.3d 439, 443 (7th Cir. 2013)).

We have also noted that a defendant is a "supervisor" or "manager" in a criminal enterprise if he "tells people what to do and determines whether they've done it." *United States v. Anderson*, 988 F.3d 420, 428 (7th Cir. 2021) (quoting *United States v. Figueroa*, 682 F.3d 694, 697 (7th Cir. 2012)). The district court here made a commonsense judgment about Lovies's relative culpability, noting that he told people what to do and determined whether they did it. So, the trial court did not commit a legal error in analyzing whether the § 3B1.1 enhancement applied to Lovies.

Although Lovies argues otherwise, the defendant's criminal organization is not required to have a formal structure for the role enhancement to apply. *United States v. Zuno*, 731 F.3d 718, 723 (7th Cir. 2013). In fact, a defendant need only control one other participant in the criminal conspiracy to qualify for the enhancement. *Id.*; *see also United States v. Herrera*, 878 F.2d 997, 1002 (7th Cir. 1989). Thus, the role enhancement can apply in even an amorphous, poorly defined criminal organization. With these principles in mind—and having rejected Lovies's legal objection to the role enhancement—we consider whether the district court clearly erred in reaching the factual findings that supported applying the enhancement to Lovies.

As trial testimony established, the district court found at the sentencing hearing that Lovies directed others in the commission of the charged offenses. The court stated that "all

of the action and direction seemed to be coming from Mr. Lovies" during the carjacking and kidnapping. In so finding, the district court relied on video evidence, trial testimony, and text messages showing Lovies recruited Hudson and initiated the plan to travel to Indiana.

We agree with the government that the evidence adequately supported the findings that Lovies recruited Hudson, selected Indiana as a destination, and provided the group with transportation by stealing cars in both Wisconsin and Indiana. At the sentencing hearing, the district court also found that Lovies brandished the firearm at Butler during the carjacking, which was consistent with Butler's testimony. There was no clear error in the district court's findings on any of these points.

A key consideration is the district court's finding that Lovies brandished the gun at Butler and took her keys while Hudson and Schultz stood by. We have noted that "relative culpability is a central concern of Guideline 3B1.1." *Weaver*, 716 F.3d at 442 (internal quotation marks and citations omitted). As the district court found, Lovies was relatively more culpable than his codefendants because he showed the gun to Butler and took her keys while L.M. kept Butler near the car and Hudson and Schultz waited. In the carjacking of Butler, Lovies played a greater role than the group's other members.

Lovies's role in the decision to kidnap Butler—in which he overruled Hudson—further demonstrates that Lovies acted as a manager or supervisor in this loose criminal organization. Trial testimony was sufficient to establish that Lovies and L.M. decided the group would abduct Butler. The district court's conclusion that Lovies was a manager or supervisor

also could have properly rested on the conclusion that he "t[old] people what to do" and dictated what would happen during the kidnapping of Butler. *Anderson*, 988 F.3d at 428. Like his brandishing of the gun during the carjacking, Lovies's role in Butler's kidnapping supports the court's application of the enhancement.

Lovies also argues that this enhancement should not apply where a criminal organization's members are not part of an ongoing conspiracy involving several transactions or more. But his argument lacks a basis in § 3B1.1's text, and our precedents have rejected it.

"[S]ingular events are not categorically excluded from qualifying for the section 3B1.1 enhancement." *Anderson*, 988 F.3d at 428 (citing *United States v. Collins*, 877 F.3d 362, 367 (7th Cir. 2017)). Even where, as here, the criminal acts are "one-time transactions," "[o]rchestrating or coordinating activities performed by others makes a particular defendant a manager or supervisor" and renders the enhancement applicable. *Id*. (quoting *United States v. Martinez*, 520 F.3d 749, 752 (7th Cir. 2008)). The district court did not clearly err in finding that Lovies orchestrated or coordinated L.M.'s actions during the kidnapping of Butler.

Although Lovies cites *Collins* to support his contention that the role enhancement does not apply to singular transactions, that case does not resolve the dispute in Lovies's favor. In *Collins*—an "atypical drug case"—we held that the district court erred in applying the role enhancement where the defendant made only an "isolated, one-time request to another independent dealer to cover for him on a sale." 877 F.3d at 364. In contrast, here there is no indication that the group's other members were engaged in "independent"

criminal enterprises divisible from the series of crimes at issue. Rather, the district court found that Lovies directed and supervised L.M. in the crime spree that included the carjacking and kidnapping of Butler. That factual finding was not clearly erroneous, so we uphold the role enhancement's application to Lovies.

Finally, even if Lovies were correct that the facts do not support the conclusion that the enhancement applies to him, we would still affirm his sentence because any error in applying the enhancement would be harmless. This follows because the district court said it would have imposed the same sentence even if we later ruled that this enhancement did not apply.

A district court's error in calculating a Sentencing Guidelines range is harmless if it "did not affect the district court's selection of the sentence imposed." *United States v. Jett*, 982 F.3d 1072, 1078 (7th Cir. 2020), *cert. denied*, 2021 WL 4508201 (U.S. Oct. 4, 2021) (citations omitted). We recently reaffirmed that any error in calculating a total offense level is harmless when the district court makes clear that—considering the sentencing factors under 18 U.S.C. § 3553(a)—it would have imposed the same sentence even if we were to conclude it had incorrectly calculated the Guidelines range. *United States v. Alvarez-Carvajal*, 2 F.4th 688, 693 (7th Cir. 2021).

The district court so specified here, which renders any error harmless. At the sentencing hearing, the district court stated it would have imposed the same sentence on Lovies even if it were to conclude the § 3B1.1 enhancement did not apply, considering the § 3553(a) factors: the nature and circumstances of Lovies's offense; the need to promote respect for the law and provide just punishment; the need to afford

adequate deterrence to criminal conduct; and the need to avoid unwarranted sentencing disparities among similarly situated defendants. Thus, any remand to the district court for it to impose the same sentence on Lovies would be a "pointless step." *Jett*, 982 F.3d at 1078 (quoting *United States v. Abbas*, 560 F.3d 660, 667 (7th Cir. 2009)). We would decline to order such a remand even if we were to conclude the district court erred in applying the role enhancement to Lovies.

*       *       *

For these reasons, we AFFIRM Lovies's convictions and his sentence.