In the

# United States Court of Appeals

### For the Seventh Circuit

―――――――――

No. 20-1229

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHARLES SKAGGS, JR.,

*Defendant-Appellant.*

―――――――――

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 17-cr-168 — **Sarah Evans Barker**, *Judge.*

―――――――――

ARGUED NOVEMBER 30, 2021 — DECIDED FEBRUARY 2, 2022

―――――――――

Before KANNE, WOOD, and HAMILTON, *Circuit Judges.*

KANNE, *Circuit Judge.* Defendant Charles Skaggs, Jr. was
charged with twelve counts related to his production and pos-
session of child pornography, based on evidence found in
several thumb drives seized from him pursuant to a warrant-
less border search at Minneapolis-St. Paul International Air-
port. Skaggs filed a motion to suppress the evidence, which
the district court denied. After a bench trial, the district court
convicted Skaggs of all counts and, believing a life sentence

was mandatory, sentenced him to life in prison. Skaggs now challenges the denial of his motion to suppress and the district court's sentencing determination, but we reject his arguments and affirm his conviction and sentence.

## I. BACKGROUND

Defendant Skaggs is an Indiana resident who was initially investigated for his alleged involvement in child sex tourism. In late 2015, Special Agent Ryan Barrett received information about Skaggs's activities from the FBI's Violent Crimes Against Children Section, Major Case Coordination Unit. Barrett learned that Skaggs had been convicted of child molestation in 1997. Barrett also learned that the Major Case Coordination Unit had received tips that: Skaggs had contacted the tipster, an individual working in child services in Ukraine, to offer the assistance of Ukrainian Angels Resource Network, an organization Skaggs had apparently registered that purportedly helped orphans and at-risk children and teens in Ukraine; Skaggs's personal Facebook page showed photographs of teen and pre-teen girls who were scantily dressed or posed in a sexually suggestive way; Skaggs traveled regularly between Indiana and Ukraine; Skaggs may have had minor girls living with him at an orphanage in Ukraine; and a former coworker of Skaggs's had contacted the tipster via Facebook stating that Skaggs told him he has a sexual interest in minors and travels to Ukraine to have sex with girls. Agent Barrett knew, based on his training and experience, that "Ukrainian Angels" was the name of a well-known child pornography website.

Agent Barrett corroborated much of the information received from the Major Case Coordination Unit, including that: Skaggs had a 1997 conviction for sexual misconduct with

a minor and was ordered to have no contact with the victim or any children under the age of 16, excluding his own children, while on probation; Skaggs frequently traveled overseas; Skaggs was the director of the Ukrainian Angels Resource Network, according to his LinkedIn profile; and Skaggs's Facebook profile contained several photographs of him with young boys and girls. Skaggs's social media also revealed that he had been involved with several other overseas orphanages, and Agent Barrett knew from his training and experience that it is common for sex offenders to be involved with child-related organizations to gain access to potential victims, including at-risk or vulnerable youth.

Given this information, Agent Barrett initiated an investigation of Skaggs in December 2015. Almost a year later, the FBI learned from another source that Skaggs planned to travel to Ukraine and intended to meet with fourteen-year-old girls. As a result of the information gathered in Agent Barrett's investigation, on December 10, 2016, Skaggs was searched and interviewed in the customs area of the Minneapolis-St. Paul International Airport during his return trip from Ukraine to his home in Indiana.

At customs, Skaggs was referred to a secondary inspection area, where he was met by an officer from Customs and Border Protection ("CBP") and a special agent from Homeland Security Investigations ("HSI"), St. Paul Field Office. The agents heard him say, "I'm ready to get fucked" and "This happens to me all the time when I fly to the U.S." Still, Skaggs agreed to be interviewed and confirmed that his bags were his. When asked whether he had any electronic equipment in his luggage, Skaggs said no and remarked that everything of that sort had been stolen while he was in Ukraine. But when

CBP officers searched Skaggs's luggage, they found four thumb drives wrapped in underwear located in his backpack. Those items, as well as an SD card and a cell phone, were taken to a different location in the airport for further inspection.

During his interview, Skaggs denied having child pornography on his thumb drives. But when an HSI computer forensics expert "previewed" the thumb drives (meaning that he made a quick examination of the media itself but did not make an image copy), he discovered several images on one of the thumb drives believed to be child erotica or pornography. All four thumb drives were seized for further analysis.

Two days after Skaggs's entry into the United States, another computer forensics expert continued the search of the thumb drives at the HSI-St. Paul Forensics Laboratory, located about two miles from the airport. Upon examination, he found suspected child pornography in the form of videos and screen captures of what appeared to be a nude teenage female using the toilet and shower. This individual was later identified to be Skaggs's daughter, who was around fourteen years old at the time the videos were taken.

Based on these findings, Agent Barrett obtained a search warrant to search the thumb drives for evidence of child pornography. Pursuant to the warrant, Barrett found numerous images and videos of child pornography and child erotica. These included video files and screen captures of Skaggs's daughter, sometimes completely nude, getting in and out of the shower and/or using the toilet. In two of the videos, the camera focused on the girl's exposed torso and breasts, and in another video, Skaggs's hand could be seen adjusting the camera to focus on the girl's genital area. Law enforcement

soon learned that Skaggs's daughter and son lived with him on the weekends, following a divorce. The thumb drives also contained child pornography not involving Skaggs's daughter, as well as web and journal articles about pedophilia. The photos and videos were well-organized in a series of user-created folders on the thumb drives, with the videos and screenshots of his daughter in the bathroom saved in a folder titled "special video."

On January 9, 2017, law enforcement officials searched Skaggs's residence in Noblesville, Indiana, pursuant to a search warrant. When the officers arrived, Skaggs stated he had been "kind of waiting" for them, presumably since his thumb drives were seized at the Minneapolis airport about a month earlier. After being advised of his *Miranda* rights, Skaggs was interviewed for about three hours. In discussing the thumb drives seized at the airport, he admitted to using hidden video equipment to secretly film his daughter while she was nude in the bathroom, as well as collecting and possessing other child pornography files. He estimated that he had made seven or eight videos of his daughter getting in and out of the shower and confirmed that she was fourteen years old at the time he took the videos. Skaggs informed the agents that his "target age" and "sexual preference" with respect to young girls was "probably somewhere in the ballpark of 14," but maintained that he no longer had a sexual interest and instead placed the hidden camera in the bathroom out of curiosity and because he was a voyeur.

Skaggs was arrested that same day and detained pending trial. Several months later, in May 2017, Skaggs called his son, Tyler Skaggs, from the detention center and asked him to visit because he wanted Tyler to "do something" for him. Tyler

visited his dad at the jail, sitting on the other side of a glass divider and speaking over a telephone. Skaggs held a hand-written note against the glass, hiding it whenever a guard walked by. The note asked Tyler to verify that a hard drive "still exists in [the] laundry room," specifically "in the ceiling tiles above those stacked bricks," and instructed Tyler to leave the hard drive in its place. Tyler returned home and checked the spot in the shared laundry room of Skaggs's apartment complex. He found the hard drive, left it in its hiding spot, and told his dad.

Jail officials reviewed a surveillance video of Tyler's visit and observed Skaggs placing a piece of paper up to the window for Tyler to read. Consequently, a search was conducted of Skaggs's cell where a letter was uncovered from his property bag that appeared to be the paper he had shown Tyler. Law enforcement then searched the laundry room and found the hard drive in the exact location described in Skaggs's note.

An agent's search of the hard drive revealed backup copies of many of the same videos of child pornography that agents had found on Skaggs's thumb drives. The agent also uncovered data indicating that Skaggs had searched the internet using terms such as "Lolita," "pedo," "incest," "preteen," and "underage." The agent was able to determine that Skaggs loaded the files onto the hard drive on December 11, 2016—the day after agents seized his thumb drives at the Minneapolis airport. Skaggs later admitted that he had purchased the hard drive the day after he returned to Indiana from Ukraine and that, over the next few days, he backed up files from his home computer, including personal business records and financial information, onto the hard drive. He also admitted that he hid the hard drive in the shared laundry room of his

apartment complex because he believed it was likely that law enforcement would arrive at some point to search his residence in connection with the seized thumb drives, and he wanted to have a backup in case law enforcement seized his original records. He denied knowing there was illegal material on the hard drive.

Skaggs was charged with twelve counts related to his production and possession of child pornography: nine counts of sexual exploitation of a child and attempted sexual exploitation of a child; two counts of possession of child pornography; and one count of concealment of evidence. He moved to suppress (1) the child pornography evidence uncovered by the border search of his thumb drives and (2) his un-*Mirandized* statements during the customs interview.

The district court held a three-day combined suppression hearing and bench trial at which Skaggs appeared *pro se*, along with two federal public defenders as standby counsel. The court denied Skaggs's motion to suppress with respect to the child pornography evidence, but it suppressed Skaggs's statements from the portion of the customs interview during which Skaggs was asked questions related to the criminal investigation, rather than routine border questions. After hearing testimony on the facts detailed above, the district court found Skaggs guilty on all counts.

The presentence investigation report stated that Skaggs's guidelines range was 360 months to life, but that life imprisonment was mandatory under 18 U.S.C. § 3559(e) for Skaggs's sexual exploitation convictions because of his prior state conviction for sexual misconduct with a minor. At his sentencing hearing, Skaggs argued that his prior conviction was not a qualifying offense under § 3559(e) and that facts relevant to

the sentencing enhancement should have been proven separately at trial. The district court rejected these arguments and imposed a mandatory life sentence as to the nine counts of sexual exploitation of a child and attempted sexual exploitation of a child. The court also imposed a concurrent 120-month sentence on the three remaining counts and a five-year term of supervised release.

Skaggs now appeals his conviction and sentence.

## II. ANALYSIS

Skaggs argues that (1) the district court erred in denying his motion to suppress the child pornography evidence uncovered by the border search and (2) the district court erred in imposing a mandatory life sentence under 18 U.S.C. § 3559(e).[1] We address each argument in turn.

### A. Motion to Suppress

Skaggs contends that the warrantless search of his thumb drives at customs violated the Fourth Amendment, in light of the heightened Fourth Amendment protection extended to cell phones by the Supreme Court in *Riley v. California*, 573 U.S. 373 (2014), and *Carpenter v. United States*, 138 S. Ct. 2206 (2018). At oral argument, however, counsel conceded that *United States v. Wanjiku*, 919 F.3d 472 (7th Cir. 2019), determines the outcome here. We agree.

---

[1] Skaggs filed a *pro se* brief raising several other issues related to his conviction and sentence. Because Skaggs is represented by counsel, however, we exercise our discretion to reject his *pro se* brief without considering these additional issues. *See United States v. Perryman*, 20 F.4th 1127, 1132 n.2 (7th Cir. 2021).

In *Wanjiku*, the defendant was stopped at O'Hare International Airport after an international trip because he was identified as an individual of interest in a child sex tourism investigation conducted by CBP and HSI. *Id.* at 474–75. The defendant was referred to a secondary inspection area and interviewed by a CBP officer. *Id.* at 475–76. The officer asked the defendant to unlock his cell phone and manually scrolled through the pictures, finding several pictures of the defendant lying in bed with a man of uncertain age who was in his underwear. *Id.* at 477. The officer turned the phone over to the HSI forensics agents, who "previewed" the defendant's cell phone and external hard drive, finding several videos and photographs of child pornography. *Id.* at 477–78. A later preview of the defendant's laptop at an HSI lab also revealed child pornography. *Id.* at 478. Based on this evidence, the defendant was charged with transportation of child pornography. *Id.*

The defendant moved to suppress the evidence collected during the searches of his electronic devices at the border, arguing that "searches of electronic devices are non-routine border searches that require reasonable suspicion or, arguably, a warrant." *Id.* at 478. The district court found that the agents had reasonable suspicion at the time of the border searches and denied the motion. *Id.* at 479. We affirmed, "because these agents acted in good faith when they searched the devices with reasonable suspicion to believe that a crime was being committed, at a time when no court had ever required more than reasonable suspicion for any search at the border." *Id.*

We reviewed Supreme Court precedent regarding border searches and indicated that the highest standard that has been applied by the Court at the border is reasonable suspicion, in

the case of highly intrusive physical searches, although typically no particularized suspicion is required because the government has a strong interest in preventing the entry of unwanted persons and effects into the country. *Id.* at 479–82. Like Skaggs, the defendant in *Wanjiku* argued that "the legal landscape for the search of cell phones changed with *Riley* and *Carpenter*," and that "even in the border context, law enforcement may search cell phones and other electronic devices only with a warrant supported by probable cause." *Id.* at 483. But we pointed out that "neither case addresses searches at the border where the government's interests are at their zenith, and neither case addresses data stored on other electronic devices such as portable hard drives and laptops." *Id.* at 484. Moreover, we stated, "no circuit court, before or after *Riley*, has required more than reasonable suspicion for a border search of cell phones or electronically-stored data." *Id.* at 485.

Therefore, we concluded that, "[g]iven the state of the law" at the time the agents conducted the border searches of the defendant's electronic devices, the agents "possessed an objectively good faith belief that their conduct did not violate the Fourth Amendment because they had reasonable suspicion to conduct the searches." *Id.* at 485–86. The same conclusion follows here. The border search of Skaggs's thumb drives occurred about a year and a half after the searches in *Wanjiku*, and Skaggs does not point to any intervening precedent on border searches. Therefore, the officials had a good faith belief that the search did not violate the Fourth Amendment because, as the district court correctly concluded, the search was supported by reasonable suspicion.

Specifically, Agent Barrett's investigation revealed that Skaggs had a prior sexual misconduct conviction; traveled

abroad multiple times and was involved with overseas orphanages; posted suggestive pictures on Facebook of himself with young girls; was the director of the Ukrainian Angels Resource Network, whose name appeared to be borrowed from a well-known child pornography website; and was suspected of child sex tourism and traveling to Ukraine to meet with minors. Skaggs also lied during his customs interview when he told officials that he had no thumb drives with him. These facts, taken together, give rise to reasonable suspicion of criminal activity. *See, e.g.*, *Wanjiku*, 919 F.3d at 487–88 (finding reasonable suspicion for border search of defendant's electronic devices because he was returning from an international destination known for child sex tourism, had been arrested for a crime involving a minor victim, displayed pictures of himself with "multiple friends who seemed very young" on his Facebook profile, and had been evasive during questioning at customs); *United States v. Cotterman*, 709 F.3d 952, 969 (9th Cir. 2013) (finding reasonable suspicion for border search of defendant's electronic devices based in part on defendant's "prior child-related conviction, frequent travels, [and] crossing from a country known for sex tourism").

No court has ever required more than reasonable suspicion for a border search. Because reasonable suspicion existed here, the district court correctly denied Skaggs's motion to suppress, given the good faith exception.

*B. Mandatory Life Sentence*

The district court sentenced Skaggs to life in prison, believing that 18 U.S.C. § 3559(e) imposed a mandatory life sentence for his sexual exploitation convictions. Section 3559(e) provides that a person convicted of a federal sex offense against a minor "shall be sentenced to life imprisonment" if

he has a prior sex conviction in which the victim was a minor. A qualifying offense includes a state sex offense that carries a prison term greater than a year and "consists of conduct that would be a Federal sex offense" if federal jurisdiction had existed. 18 U.S.C. § 3559(e)(2)(B). Skaggs argues that his prior state conviction for sexual misconduct with a minor was not a qualifying offense under § 3559(e) because the applicable state statute is broader than its supposed federal analogue, 18 U.S.C. § 2243.

The government concedes that the district court made an error, albeit a different one. The district court found that Skaggs's prior state conviction corresponded to a "Federal sex offense" under 18 U.S.C. § 2243. But that provision—§ 2243—is not included in the narrow definition of "Federal sex offense" that triggers § 3559(e)'s mandatory life provision. *See* 18 U.S.C. § 3559(e)(2)(A) (listing the federal statutes that count as federal sex offenses). Accordingly, the application of § 3559(e) was erroneous.

Nonetheless, the error was harmless because the same sentence would have been imposed despite the error. *See United States v. Anderson*, 517 F.3d 953, 965 (7th Cir. 2008) ("An error is harmless if it 'did not affect the district court's selection of the sentence imposed.'" (quoting *Williams v. United States*, 503 U.S. 193, 203 (1992))).

At sentencing, the district court stated, "[I]n any event, in my discretion, I would impose a life sentence on Counts 1 through 9 even if it weren't a mandatory life sentence because of the seriousness of the conduct that was reflected in Counts 1 through 9." The sentence was within the guidelines range of 360 months to life. The court explained how the sentence reflected the relevant 18 U.S.C. § 3553(a) factors, taking into

account "the nature and circumstances of these offenses, which are pretty breathtakingly serious, some of the most serious charges the [c]ourt faces," as well as Skaggs's "history and characteristics," noting that his pedophilia has been "persistent" and "a long-term problem." The court also acknowledged "troublesome facts"—like Skaggs's activities focusing on girls in Ukraine and his attempt to hide a backup copy of his illicit materials—"that reinforced my opinion that this has been a very long pattern of behavior that has to be curtailed by the [c]ourt's sentence today."

Because the district court said it would have imposed a life sentence in any event and discussed the § 3553(a) factors that supported the sentence, its error was harmless, and "any remand to the district court for it to impose the same sentence on [Skaggs] would be a 'pointless step.'" *United States v. Lovies*, 16 F.4th 493, 508 (7th Cir. 2021) (quoting *United States v. Jett*, 982 F.3d 1072, 1078 (7th Cir. 2020)).

### III. Conclusion

For these reasons, we AFFIRM Skaggs's conviction and sentence.