RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0207p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

No. 17-1918

SARDAR ASHRAFKHAN,

*Defendant-Appellant*.

───────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:11-cr-20551-12—Robert H. Cleland, District Judge.

Argued: April 29, 2020

Decided and Filed: July 10, 2020

Before: BOGGS, GRIFFIN, and READLER, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Kent Wicker, DRESSMAN BENZINGER LA VELLE PSC, Louisville, Kentucky, for Appellant. Wayne F. Pratt, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee. **ON BRIEF:** Kent Wicker, DRESSMAN BENZINGER LA VELLE PSC, Louisville, Kentucky, for Appellant. Wayne F. Pratt, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

───────────────

## OPINION

───────────────

BOGGS, Circuit Judge. Sardar Ashrafkhan came to the United States in 1991 after receiving a scholarship to study at Michigan State University. He earned a Ph.D. in 1996 with a research focus on pathology and the genetics of cancer. He settled in Ypsilanti, Michigan and

soon became an active member of the community. However, according to prosecutors, Ashrafkhan's life did not continue so wholesomely. In 2006, he founded Compassionate Doctors ("Compassionate"), a medical practice outside of Detroit. But it appears that Compassionate was nothing more than a sham, and indeed was a "pill mill," where unscrupulous doctors would write fraudulent prescriptions for fake patients. Compassionate would then bill Medicare for the fake patient visits, and it collected millions of dollars in Medicare payments over the course of several years. Worse yet, the fraudulent prescriptions would be filled by individuals recruited by Compassionate at pharmacies that paid Compassionate kickbacks. Those drugs would then be sold on the street, resulting in hundreds of thousands of opioid-based drugs being distributed onto the illegal drug market.

Ashrafkhan was tried and convicted of one count of conspiracy to distribute controlled substances, one count of conspiracy to commit healthcare fraud, and two counts of money laundering. He was sentenced to twenty-three years of imprisonment. Ashrafkhan now appeals, raising a number of arguments against his prosecution, ranging from his indictment to his sentencing. We affirm Ashrafkhan's conviction and sentence, writing for publication only with regard to our discussion of the jury instruction on reasonable doubt. All other issues raised by Ashrafkhan are addressed and decided in an unpublished appendix to this opinion.

## I. BACKGROUND

### A. Factual Background

Sardar Ashrafkhan was the owner of Compassionate Doctors ("Compassionate"), a medical clinic he established in 2006. Although from the outside, Compassionate appeared to be a real clinic that provided legitimate services, the government alleged that it was nothing more than a "pill mill"—a sham clinic where unethical doctors would prescribe large quantities of opioids to individuals who did not need them. The opioids were later sold on the street and Compassionate would bill Medicare for the fake "patient visits" that had supposedly occurred.

The scheme was simple. Compassionate would pay associates whom it called "marketers"—generally small-time criminals or drug dealers—to recruit fake patients to the clinic. These patients were not ill, nor did they visit Compassionate for any real treatment.

Instead, Compassionate's doctors would write fraudulent prescriptions for the "patient," often without conducting any medical examination or even seeing the patient at all. Compassionate would then bill the patient's health insurance (Medicare) for the "visits," while the "marketers"—in addition to the money they received from Compassionate for recruiting fake patients—would earn money by filling the fake prescriptions and selling the drugs on the street. From January 1, 2007 to January 10, 2013, Compassionate filed 65,649 Medicare Part B claims for patient visits and related procedural care, claiming over $10 million in reimbursement, of which they were ultimately paid over $6.5 million. During the same period, the government alleged that Compassionate's prescriptions resulted in approximately 500,000 doses of controlled substances being distributed onto the illegal market. As the owner and operator of Compassionate, Ashrafkhan benefited handsomely from the scheme. Between 2008 and 2010, alone, Ashrafkhan deposited more than $2 million from Compassionate's business account into his own personal account. When he was arrested in 2013, the government also seized over $1 million in assets.

On January 10, 2013, Ashrafkhan was charged with one count of conspiracy to distribute controlled substances, 21 U.S.C. §§ 841(a)(1), 846; one count of healthcare-fraud conspiracy, 18 U.S.C. §§ 1347, 1349; and two counts of money laundering, 18 U.S.C. § 1957. Ashrafkhan was convicted at trial of all charges. He was sentenced to an aggregate term of twenty-three years of imprisonment (276 months in total); 240 months for the drug-distribution conspiracy count, 120 months for the healthcare-fraud-conspiracy count—with 36 months to run consecutively and the remaining 84 months to run concurrently—and 120 months for the two money-laundering counts, to run concurrently.

Ashrafkhan timely appealed, making a variety of arguments. In particular, he claims that: his indictment had been constructively amended, several of his jury instructions were improper, there was prosecutorial misconduct before and during his trial, there was insufficient evidence to convict him, and the district court made several errors in its assessment of the Sentencing Guidelines. In this published opinion, we address only Ashrafkhan's objection to his reasonable-doubt instruction. All other issues are addressed and decided in an unpublished appendix to this opinion.

## II.  DISCUSSION

Ashrafkhan's primary challenge on appeal pertains to the language of the reasonable-doubt instruction that the district court gave at trial.  Because Ashrafkhan objected to the instruction in the proceedings below, we review for an abuse of discretion.  *See United States v. Eaton*, 784 F.3d 298, 306 (6th Cir. 2015).  We will reverse a conviction based on improper jury instructions on abuse-of-discretion review "only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial," *United States v. Morrison*, 594 F.3d 543, 546 (6th Cir. 2010) (citation omitted), and a reversal of a conviction is generally unwarranted unless the instructions have clearly misstated the law, *see United States v. Lawrence*, 735 F.3d 385, 428 (6th Cir. 2013).

> The Sixth Circuit provides the following model instruction on reasonable doubt:
>
> Proof beyond a reasonable doubt means proof which is so convincing that you would not hesitate to rely and act on it in making the most important decisions in your own lives.  If you are convinced that the government has proved the defendant guilty beyond a reasonable doubt, say so by returning a guilty verdict.  If you are not convinced, say so by returning a not guilty verdict.

Sixth Circuit Pattern Criminal Jury Instructions 1.03(5).  At Ashrafkhan's trial, the district court chose to not give this instruction.  Instead, it instructed the jury that:

> A "reasonable doubt" is a fair, honest doubt growing out of the evidence or lack of evidence, or the nature of the evidence, and based on reason and common sense.  Ultimately, a "reasonable doubt" would simply be a doubt that is still standing—a doubt you find to be reasonable—after you have carefully and thoughtfully examined and discussed all the facts and circumstances present in this case.  Proof "beyond a reasonable doubt" does not mean proof that amounts to absolute certainty, or beyond all possible doubt, nor does it mean that the government must prove any fact or any crime with mathematical precision.  Doubts that are merely imaginary, or that arise from nothing more than speculative possibilities, or that are based only on sympathy, prejudice or guessing are not "reasonable" doubts.

Ashrafkhan argues that the district court's decision to omit language describing proof beyond a reasonable doubt as "proof which is so convincing that you would not hesitate to rely and act on it in making the most important decisions in your own lives" was an error that entitles him to a new trial.  He contends that, without this instruction, there was nothing to inform the jury that it

must apply a higher standard of proof than what would normally be required in civil cases (the preponderance-of-the-evidence standard).  In effect, Ashrafkhan asks us to make the "would not hesitate" to act language mandatory for all reasonable-doubt instructions.  We decline to do so, and we hold that the district court did not err in not using the model instruction.

We start with the basics.  The Supreme Court, in *In Re Winship*, held that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  397 U.S. 358, 364 (1970).  *Winship* noted that the beyond-a-reasonable-doubt standard is not a textual mandate from the Constitution, but instead that it "dates at least from our early years as a Nation" and has been "accepted in common law jurisdictions as the measure of persuasion by which the prosecution must convince the trier of all the essential elements of guilt."  *Id*. at 361 (citation omitted).  The standard thus "plays a vital role in the American scheme of criminal procedure," and acts as a bulwark against possible errors that inevitably always exist in determining facts during litigation:  "Where one party has at stake an interest of transcending value—as a criminal defendant his liberty—this margin of error is reduced as to him by the process of placing on the other party the burden of" proving guilt beyond a reasonable doubt.  *Id*. at 363–64.

However, *Winship* did not provide a precise definition of the reasonable-doubt standard or exact language for how to express it.  The Supreme Court has since held that "the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof."  *Victor v. Nebraska*, 511 U.S. 1, 5 (1994).  All that is required is that "the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt," and even then, "the Constitution neither prohibits trial courts from defining reasonable doubt *nor requires them to do so as a matter of course*."  *Ibid*. (emphasis added).  Put simply, courts are not required to define reasonable doubt; all that is required is that if a court chooses to define the standard, that it makes clear to the jury that the burden of proof is high.  *See id*. at 14 (noting the "very high level of probability required by the Constitution in criminal cases"); *Jackson v. Virginia*, 443 U.S. 307, 315 (1979) (noting that the reasonable-doubt standard is necessary for "impressing upon the factfinder the need to reach a subjective state of near

certitude of the guilt of the accused," and that "the standard symbolizes the significance that our society attaches to the criminal sanction and thus to liberty itself").

In *Victor*, the Supreme Court explained that it has only ever invalidated one definition of reasonable doubt as unconstitutional. In *Cage v. Louisiana*, 498 U.S. 39 (1990) (per curiam), the Court invalidated an instruction that "equated a reasonable doubt with a 'grave uncertainty' and an 'actual substantial doubt,'" but which still instructed the jury to convict if it believed to a "'moral certainty' that the defendant was guilty."[1]  *Id*. at 40.  The Court held that the plain meaning of words like "grave" and "substantial" "suggest a higher degree of doubt than is required for acquittal under the reasonable-doubt standard." *Id*. at 41.  And when those words were "considered with the reference to 'moral certainty' rather than evidentiary certainty, it becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause." *Ibid*.  Put simply, the instruction in *Cage* was worded in a way that would confuse the jury, and which increased the likelihood that the jury could convict on evidence that was less than what the Constitution required.

Building on *Cage*, the Supreme Court held in *Victor* that the constitutional question in evaluating a definition of reasonable doubt, "is whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the *Winship* standard." 511 U.S. at 6.  A reviewing court's role in evaluating a trial court's reasonable-doubt instruction should thus be focused solely on whether the instruction was sufficient to apprise the jury of the government's high burden of proof.  It should not fixate on specific language that was included or omitted.  As long as the instruction does not confuse the jury about the high burden of proof, a definition of reasonable doubt should be upheld. *See*

---

[1]The full instruction in *Cage* defined a reasonable doubt as:

> one that is founded upon a real tangible substantial basis and not upon mere caprice and conjecture. It must be such doubt as would give rise to a grave uncertainty, raised in your mind by reasons of the unsatisfactory character of the evidence or lack thereof. A reasonable doubt is not a mere possible doubt. It is an actual substantial doubt. It is a doubt that a reasonable man can seriously entertain. What is required is not an absolute or mathematical certainty, but a moral certainty.

498 U.S. at 40.

*Holland v. United States*, 348 U.S. 121, 140 (1954) ("Attempts to explain the term 'reasonable doubt' do not usually result in making it any clearer to the minds of the jury." (citation omitted)); *see generally* 9 Wigmore, Evidence § 2497 at 414–15 (Chadbourn rev. 1981) ("[W]hen anything more than a simple caution and a brief definition is given, the matter tends to become one of mere words, and the actual effect upon the jury, instead of being enlightenment, is likely to be rather confusion or, at the least, a continued incomprehension.").

Although *Victor* recognized the "would not hesitate" language as constitutional, jurists have noted that such language may tend to understate the government's burden of proof and have expressed trepidation at fully endorsing it. *See Ramirez v. Hatcher*, 136 F.3d 1209, 1214 (9th Cir. 1998) ("Because people often act in important matters notwithstanding substantial uncertainty, the fear is that defining proof beyond a reasonable doubt in relation to a person's willingness to act in the weightier affairs of life might understate the government's burden of proof."); *Scurry v. United States*, 347 F.2d 468, 470 (D.C. Cir. 1965) (noting "a substantial difference between a juror's verdict of guilt beyond a reasonable doubt and a person making a judgment in a matter of personal importance to him"); *see also* Jon O. Newman, *Beyond "Reasonable Doubt,"* 68 N.Y.U. L. Rev. 979, 983 (1993). Comparing the hesitation that one would feel at making a momentous life decision with the decision to convict in a criminal case may indeed be inapposite, as "decisions we make in the most important affairs of our lives—choosing a spouse, a job, a place to live, and the like—generally involve a very heavy element of uncertainty and risk-taking" and "are wholly unlike the decisions jurors ought to make in criminal cases." *Victor*, 511 U.S. at 24 (Ginsburg, J., concurring in part and concurring in the judgment) (quoting Federal Judicial Center, Pattern Criminal Jury Instructions 18-1919 (1987) (commentary on instruction 21)).

Given these principles, our role in reviewing a district court's reasonable-doubt instruction must focus solely on whether the instruction would tend to confuse the jurors or indicate to them that the standard does not place a high burden of proof on the government. Against this backdrop, we can find no fault in the instruction given. The instruction stressed to the jury the need to base its decision on "the evidence or lack of evidence" and that a reasonable doubt was one that was "still standing" after all of the evidence had been considered.

The instruction also stated that while the jury need not find every fact with absolute certainty, that a reasonable doubt was one that was "fair" and "honest," implying a high burden of proof on the government. Indeed, we have consistently held that reasonable-doubt instructions almost identical to the one here were constitutional. For example, in *Binder v. Stegall*, we held that a Michigan court's description of reasonable doubt as "a fair, honest doubt growing out of the evidence or lack of evidence. It is not merely an imaginary doubt or possible doubt, but a doubt based upon reason and common sense," was constitutional. 198 F.3d 177, 178 (6th Cir. 1999). When the state trial court originally gave this instruction, Michigan had only recently changed its model reasonable-doubt instruction to omit the exact "would not hesitate" language that Ashrafkhan would ask us to mandate. The petitioner, on habeas review, argued that this change in the reasonable-doubt instruction rendered his conviction invalid, but we concluded that although we have approved of the "hesitate to act" language in the past, we "did not *require* that the language be included." *Id*. at 179. We have arrived at a similar conclusion when upholding on direct appeal several nearly identical reasonable-doubt instructions as well. *See United States v. Carmago-Antonio,* 541 F. App'x 678, 679–80 (6th Cir. 2013) (per curiam); *United States v. Balogun,* 463 F. App'x 476, 484 (6th Cir. 2012); *United States v. Kish,* 424 F. App'x 398, 406–07 (6th Cir. 2011). The district court's reasonable-doubt instruction thus did not amount to reversible error.

\* \* \*

For the foregoing reasons, and for the reasons stated in our unpublished appendix to this opinion, we AFFIRM Ashrafkhan's conviction and sentence.