In the

 United States Court of Appeals
 For the Seventh Circuit
 ____________________
No. 21-2724
UNITED STATES OF AMERICA,
 Plaintiﬀ-Appellee,
 v.

THOMAS R. ALT,
 Defendant-Appellant.
 ____________________

 Appeal from the United States District Court for the
 Central District of Illinois.
 No. 19-cr-10056 — James E. Shadid, Judge.
 ____________________

 ARGUED NOVEMBER 28, 2022 — DECIDED JANUARY 25, 2023
 ____________________

 Before ROVNER, ST. EVE, and KIRSCH, Circuit Judges.
 ST. EVE, Circuit Judge. Thomas Alt made plans to meet with
a ﬁfteen-year-old boy whom he met on Grindr (a popular da-
ting app) to smoke marijuana and engage in sexual activity.
What Alt did not know was that the boy was actually an un-
dercover FBI Agent. Alt was arrested later that day when he
attempted to meet up with the boy. After a three-day jury
trial, Alt was convicted of attempted enticement of a minor
and sentenced to the mandatory minimum 120 months in
2 No. 21-2724

prison, followed by ﬁfteen years of supervised release. He
timely ﬁled this appeal challenging the district court’s denial
of his motion to suppress, claiming the government commit-
ted a Batson violation, and arguing he was deprived of a fair
trial because of the government’s statements during closing
arguments. Alt also challenges the requirement that he partic-
ipate in a sex oﬀender treatment program as a condition of his
supervised release. We now aﬃrm.
 I. Background
 On November 1, 2019, Thomas Alt—then twenty-six years
old—sent a message to a Grindr account operated by an un-
dercover FBI Agent. The account included the picture of a
youthful-looking boy and listed his age as eighteen years old,
the minimum required to use the Grindr app. The boy re-
sponded to Alt after Alt sent two more messages. During their
subsequent conversation, the two discussed meeting up to en-
gage in sexual activity and smoke marijuana. The boy explic-
itly told Alt that he was only ﬁfteen years old, but Alt contin-
ued with his plans to meet. Approximately an hour-and-a-
half after the boy ﬁrst responded, FBI agents arrested Alt out-
side of what Alt believed to be the boy’s home. At the time of
his arrest, Alt had a tablet with the Grindr app and messages,
an iPhone, and marijuana.
A. Post-Arrest Interview
 FBI agents interviewed Alt following his arrest. Prior to
any substantive questioning, the following exchange oc-
curred:
 FBI: So, before we ask you any questions, you must un-
 derstand your rights. You have the right to remain si-
 lent, anything you say can be used against you in court.
No. 21-2724 3

 You have the right to talk to a lawyer for advice before
 we ask questions, uh, you have a right to have a lawyer
 with you during the questioning. If you cannot aﬀord
 a lawyer, one will be appointed for you before any
 questioning if you wish. If you decide to answer ques-
 tions now without a lawyer present, you have the right
 to stop answering at any time. So, that last one is the
 big one.
 ALT: Yep.
 FBI: So, no matter what you say, if you decide that you
 want to have a lawyer, then we stop. So just, any
 time …
 ALT: And, real quick, on the, uh, appointed lawyer, do
 you have a lawyer here?
 FBI: No.
 ALT: Ok, gotcha, so I would have to schedule some-
 thing.
 FBI: So, that would be appointed at your initial appear-
 ance.
 ALT: Yeah, ok.
 FBI: So, um, then, I got a consent statement here. So, if
 you could just read that out loud.
 ALT: Ok. Uh, I have read this statement of my rights,
 and I understand what my rights are. At this time, I am
 willing to answer, uh, questions without a lawyer.
 FBI: If that is correct, then uh, if you believe that, then
 go ahead, and sign where it says signed.
4 No. 21-2724

 ALT: Allowing that I’m still able to stop when when-
 ever.
 FBI: Whenever you want.
 ALT: Perfect, ok, solid.…
 After signing the consent statement, Alt admitted that he
was the one using the Grindr app to send messages to whom
he believed to be a ﬁfteen-year-old boy. But Alt claimed that,
while the two were originally planning on engaging in sexual
activity, after learning the boy was only ﬁfteen years old, Alt
only planned to “hang out,” “smoke a little bit,” and have a
“cool conversation.”
B. Pre-trial Motions
 Two days after his arrest, the government ﬁled a criminal
complaint against Alt, charging him with one count of at-
tempted enticement of a minor under 18 U.S.C. § 2422(b). A
grand jury indicted Alt two weeks later.
 Alt subsequently moved to suppress the statements he
made to the FBI, arguing that he unequivocally invoked his
right to counsel when he said, “do you have a lawyer here?”
after the agents read him his Miranda rights. The district court
denied the motion: “In viewing the context of his statements,
Alt appeared to be contemplating whether to ask for counsel
or asking about the process if he did request counsel in the
future …. Even if Alt was attempting to invoke his right to
counsel, it was not unambiguous and unequivocal.”
 With his suppression motion denied, Alt’s case proceeded
to trial.
No. 21-2724 5

C. Jury Selection
 During jury selection the government asked if any pro-
spective juror had any negative experiences with law enforce-
ment. Only Juror 68—the only African American prospective
juror—raised his hand. Juror 68 recounted how he was forced
to plead guilty to a DUI charge that he did not commit. When
the district court asked if Juror 68 would nonetheless be able
to keep an open mind when listening to the evidence here and
make a decision based solely on the facts, Juror 68 responded
“absolutely.”
 Later, the government asked if any prospective juror had
experiences with sexual abuse. Three jurors raised their
hands, including Juror 68. While being uncertain on the de-
tails, Juror 68 stated that he had “a couple of family members”
and “close personal friends” “go through a situation of sexual
abuse” as minors. When the government asked if Juror 68
would be able to objectively view the evidence despite these
experiences, Juror 68 responded, “I would … stick with the
facts. … This is a totally diﬀerent situation, so you have to take
it for what it is right now.”
 Based on Juror 68’s responses to these two questions—and
that he “provided some hesitancy” when responding—the
government asked the district court to excuse Juror 68 for
cause. Alt opposed excusing Juror 68 for cause because Juror
68 was the only African American prospective juror and ex-
plicitly stated that he could look at the evidence objectively
and would not be biased. The district court denied the gov-
ernment’s request.
 The government then used a peremptory challenge to
strike Juror 68, and Alt objected under Batson v. Kentucky, 476
6 No. 21-2724

U.S. 79 (1986). To support its use of a peremptory challenge,
the government incorporated its reasons for requesting to ex-
cuse Juror 68 for cause.
 As we talked back and forth, you know, there were
 times when he shrugged his shoulders, where he was
 hesitant; he paused. … [T]hat hesitation is what we
 don’t want [from] a juror coming out of the gate listen-
 ing to the facts. … [H]ere is a man that pleaded for
 something that he was innocent for. Well, that creates
 … an unconscious bias …. And then on top of that …
 he has family members [and friends] that [were] in-
 volved in sexual abuse. And so we would rather just
 have somebody that … [is] able to sit there and listen
 to the facts of the[] case without that extra baggage or
 weight weighing them down.
The district court denied Alt’s Batson challenge, holding that
the government provided suﬃcient race-neutral reasons for
the strike. Once the jury was empaneled, the case proceeded
to trial.
D. Jury Instructions, Closing Arguments, & The Verdict
 At the close of evidence, the district court instructed the
jury that “[t]he government has the burden of proving the de-
fendant’s guilt beyond a reasonable doubt. This burden of
proof stays with the government throughout the case.”
 Later, during its closing argument, the government added:
 [When] you are considering the evidence and whether
 it ﬁts these three elements, keep in mind the govern-
 ment’s burden; it is beyond a reasonable doubt. It is not
 beyond all doubt. It is not beyond any shadow of a
 doubt.
No. 21-2724 7

 Alt objected to the government “deﬁning” the reasonable
doubt standard. The district court overruled the objection and
instructed the jury, “I’ve not instructed you as to any deﬁni-
tion of ‘beyond a reasonable doubt’ or ‘reasonable doubt,’ so
that is for you to ultimately determine what you believe to be
reasonable doubt.” During his closing argument, Alt reiter-
ated to the jury that “[i]t’s for you to decide what beyond a
reasonable doubt means.”
E. Sentence & Condition of Supervised Release
 The jury ultimately convicted Alt of attempted enticement
of a minor under 18 U.S.C. § 2422(b). The district court sen-
tenced Alt to the mandatory minimum 120 months in prison,
followed by ﬁfteen years of supervised release. As a condition
of his supervised release, the court ordered Alt to participate
in a sex oﬀender treatment program approved by the U.S.
Probation Oﬃce.
 II. Discussion
 Alt appeals the district court’s (1) denying his motion to
suppress, (2) overruling his Batson challenge, (3) overruling
his objection to the Government’s closing arguments, and
(4) ordering that he participate in a sex oﬀender treatment
program as a condition of his supervised release.
A. Motion to Suppress
 Alt ﬁrst argues that the district court erred when it denied
his motion to suppress his statements to the FBI. We review
the district court’s legal conclusion regarding whether a de-
fendant unequivocally invoked his Fifth Amendment right to
counsel de novo. United States v. Bebris, 4 F.4th 551, 560 (7th
Cir. 2021).
8 No. 21-2724

 “[A] suspect is entitled to the assistance of counsel during
custodial interrogation ….” Davis v. United States, 512 U.S.
452, 462 (1994) (citing Miranda v. Arizona, 384 U.S. 436 (1966)).
And during such an interrogation, “if the suspect invokes the
right to counsel at any time, the police must immediately
cease questioning him until an attorney is present.” Davis, 512
U.S. at 462 (citing Edwards v. Arizona, 451 U.S. 477 (1981)). But
in order to trigger this protection, the invocation of the right
to counsel must be unequivocal. United States v. Hunter, 708
F.3d 938, 943 (7th Cir. 2013); United States v. Hampton, 885 F.3d
1016, 1019 (7th Cir. 2018). In determining when a request for
counsel is clear enough, “our court has found statements in-
dicating a certain and present desire to consult with counsel
suﬃcient to invoke a defendant’s right to counsel.” Hunter,
708 F.3d at 943; see also Hampton, 885 F.3d at 1020 (invoking
the right requires action-oriented words—i.e., statements that
“request an action (or permission to act).”). “[A]n ambiguous
or equivocal reference to an attorney” is not suﬃcient to trig-
ger the Edwards rule. Davis, 512 U.S. at 459. When making this
assessment, “we consider the circumstances in which the
statement was made as well as the words employed.” United
States v. Wysinger, 683 F.3d 784, 793–94 (7th Cir. 2012).
 It is undisputed here that Alt was subjected to a custodial
interrogation. Thus, the issue is whether Alt unequivocally in-
voked his right to counsel during that interrogation. He did
not. Alt’s alleged invocation—“real quick, on the, uh, ap-
pointed lawyer, do you have a lawyer here?”—does not “in-
dicat[e] a certain and present desire to consult with counsel.”
See Hunter, 708 F.3d at 943. Alt’s statement is devoid of any
action-oriented words—such as “can”—that we have held
suﬃcient to unequivocally invoke the right. See id. at 944
(“The defendants’ choice of the word ‘can,’ by deﬁnition,
No. 21-2724 9

means that they were inquiring into their present ability to be
‘able to’ obtain a lawyer or to ‘have the opportunity or possi-
bility to’ obtain a lawyer.”). Indeed, “do you have a lawyer
here?” suggests that Alt was still undecided about whether he
wanted a lawyer.
 Looking at this statement in context, Alt was merely in-
quiring into the process if he did request to speak to counsel.
As the district court aptly noted, “[i]f counsel was there and it
was convenient at the time for Alt, then he considered asking
for counsel. But since counsel was not immediately there at
the residence where Alt was arrested and Alt was seemingly
ready to talk now, he chose to not ask for a lawyer and to
speak to the Agents instead.” At best, Alt’s statement indi-
cated that he might want to speak to counsel. This is insuﬃ-
cient to unequivocally invoke the right. See Davis, 512 U.S. at
459 (“But if a suspect makes a reference to an attorney that is
ambiguous or equivocal in that a reasonable oﬃcer in light of
the circumstances would have understood only that the sus-
pect might be invoking the right to counsel, our precedents do
not require the cessation of questioning.”) (emphasis in origi-
nal).
 As part of this assessment, Alt asks us to consider the
Agent’s statements after Alt allegedly invoked his right to
counsel. According to Alt, the Agent’s response that counsel
would be provided at his initial appearance improperly indi-
cated that counsel could not be consulted prior to the present
questioning. This argument misunderstands the Edwards
bright line rule. “[C]ourts should only consider prior context
when determining whether a defendant unambiguously in-
voked his right to counsel.” Hunter, 708 F.3d at 945 (emphasis
added). If Alt unequivocally invoked his right to counsel, then
10 No. 21-2724

nothing law enforcement said after that could negate the ef-
fect of his invocation, and all subsequent statements must be
excluded. Law enforcement’s post-invocation statements are
irrelevant to whether Alt invoked his right to counsel in the
ﬁrst place. 1
 The district court did not err in denying Alt’s motion to
suppress.
B. Batson Challenge
 Alt argues next that the district court erred in denying his
Batson challenge because the government’s race neutral rea-
sons for challenging Juror 68 were not reasonable. We review
a district court’s “Batson ﬁndings for clear error.” United States
v. Lovies, 16 F.4th 493, 500 (7th Cir. 2021) (quoting United States
v. Cruse, 805 F.3d 795, 806 (7th Cir. 2015)). Our review is
highly deferential. Lovies, 16 F. 4th at 500 (citing Hunter, 932
F.3d at 617). “Deference is necessary because a reviewing
court, which analyzes only the transcripts from voir dire, is
not as well positioned as the trial court to make credibility de-
terminations. Thus, we aﬃrm unless ‘we arrive at a deﬁnitive
and ﬁrm conviction that a mistake has been made.’” Lovies, 16
F. 4th at 500 (quoting United States v. Rutledge, 648 F.3d 555,
558 (7th Cir. 2011) and Cruse, 805 F.3d at 806).
 Batson prohibits prosecutors from “challeng[ing] potential
jurors solely on account of their race or on the assumption that

 1 Alt’s reliance on Wysinger, 683 F.3d at 802, does not warrant a diﬀer-

ent result. In Wysinger, we found that law enforcement’s “pattern of diver-
sion,” post-invocation, was improper “because it relates to and supports
Wysinger’s claim of misleading Miranda warnings.” Id. at 802. Alt does not
allege that the Miranda warnings were misleading. Thus, this holding in
Wysinger is inapplicable here.
No. 21-2724 11

black jurors as a group will be unable impartially to consider
the State’s case against a black defendant.” Batson v. Kentucky,
476 U.S. 79, 89 (1986). Accordingly, to prevail on a Batson chal-
lenge, Alt “must show the government had a racially discrim-
inatory intent in exercising its peremptory strike” to remove
Juror 68. Lovies, 16 F.4th at 499.
 A Batson challenge has three steps:
 First, a challenger must make a prima facie case that
 the peremptory strike was racially motivated. … The
 second Batson step requires only that the explanation
 oﬀered in defense of the strike be non-discriminatory.
 … At the third and ﬁnal step, the trial court must de-
 termine whether the opponent of the strike has carried
 his burden of proving purposeful discrimination.
Id. at 499–500 (citations omitted).
 As the government proﬀered race-neutral reasons for the
strike which the district court ruled on, we review only the
third step—“whether the opponent of the strike has carried
his burden of proving purposeful discrimination.” 2 We hold
that Alt has not met this burden.

 2 Alt’s sole argument to support his Batson challenge is that Juror 68

was the only African American prospective juror. This is not suﬃcient to
state a prima facie case that the strike was racially motivated. See Lovies,
16 F. 4th at 499 (“To meet this burden at the ﬁrst step, however, the strike’s
opponent cannot merely point to the stricken juror’s race.”) (citation omit-
ted). However, “[o]nce a prosecutor has oﬀered a race-neutral explanation
for the peremptory challenges and the trial court has ruled on the ultimate
question of intentional discrimination, the preliminary issue of whether
the defendant had made a prima facie showing becomes moot.” Id. at 503
(quoting Hernandez v. New York, 500 U.S. 352, 359 (1991)).
12 No. 21-2724

 The government pointed to two potential biases, as well as
the juror’s demeanor, to support its use of the peremptory
strike. Foremost, Juror 68 was the only juror to indicate that
he had had negative interactions with law enforcement, being
forced to plead guilty to an oﬀense he did not commit. While
Juror 68 stated that he could “absolutely” keep an open mind
when looking at the evidence in this case despite this experi-
ence, he also noted that, “I don’t think that it would be total
bias. There [is] going to be some unconscious bias. I think that
can happen. I think that’s just a natural thing to do.” Further
animating the government’s concern here, all four witness
whom the government planned to call at trial (and ultimately
did call) were law enforcement personnel. Thus, Juror 68’s
acknowledgement that his prior negative experience with law
enforcement created “some unconscious bias” is a legitimate
race-neutral reason to strike the juror. See United States v.
Brown, 809 F.3d 371, 376 (7th Cir. 2016) (“[B]ias against law
enforcement is a legitimate race-neutral justiﬁcation.”) (citing
United States. v. Smallwood, 188 F.3d 905, 915 (7th Cir. 1999)).
 Juror 68’s indication that he has both family and friends
who have had negative experiences with sexual abuse as mi-
nors, the very subject of this case, also created a risk of bias

 Even so, as a reminder, we recently “encourage[d] district courts to
follow each of Batson’s three steps in sequence and to develop a compre-
hensive record as to each step.” Lovies, 16 F. 4th at 503. “The Supreme
Court has designed the three Batson steps as a bulwark to protect against
racial discrimination. By methodically working through each step of a Bat-
son challenge, and not collapsing them into a single inquiry, a crystal-clear
record is developed for the beneﬁt of all, including to facilitate appellate
review.” Id. at 503–04 (citations mitted).
No. 21-2724 13

which constitutes a suﬃcient race-neutral reason to strike the
juror.
 Finally, the government pointed to Juror 68’s demeanor in
responding to questions as another reason for the peremptory
strike: “As we talked back and forth, you know, there were
times when he shrugged his shoulder, where he was hesitant;
he paused.” Being present during voir dire, the district court
was able to independently assess and consider both the pros-
ecutor’s and Juror 68’s demeanor when ruling on Alt’s Batson
challenge, and “[w]e accord the district judge’s credibility de-
termination great deference on appeal.” See Lovies, 16 F. 4th at
502 (“From his ﬁrsthand vantage point, the district judge was
in the best position to make the determination that the prose-
cutors were sincere.”); id. at 501 (“A trial judge’s ﬁrsthand ob-
servations of a juror’s demeanor are important where a per-
emptory strike’s proponent refers to that demeanor.”). We do
so here, as well.
 The district court did not clearly err in denying Alt’s Bat-
son challenge.
C. Deﬁning the Reasonable Doubt Standard
 Alt also alleges that the government’s discussion of the
standard of proof constitutes reversible error. During closing
arguments, the prosecutor told the jury, “[when] considering
the evidence and whether it ﬁts these three elements, keep in
mind the government’s burden; it is beyond a reasonable
doubt. It is not beyond all doubt. It is not beyond any shadow
of a doubt.” Alt objected and the district court overruled his
objection. “We review for abuse of discretion a district court’s
‘decision to overrule an objection to comments in a closing ar-
gument.’” United States v. Chavez, 12 F.4th 716, 728 (7th Cir.
14 No. 21-2724

2021) (quoting United States v. Lopez, 870 F.3d 573, 579 (7th Cir.
2017)). This analysis is a two-step process, asking “(1)
‘whether the prosecutor’s comments were improper standing
alone,’ and if improper, (2) ‘whether the remarks in the con-
text of the whole record denied the defendant[ ] the right to a
fair trial.’” Chavez, 12 F.4th at 728 (quoting United States v.
Kelerchian, 937 F.3d 895, 916 (7th Cir. 2019)).
 “Many times in the past, we have been explicit about the
inappropriateness of deﬁning ‘reasonable doubt.’” United
States v. Alex Janows & Co., 2 F.3d 716, 722 (7th Cir. 1993). We
have been so clear, in fact, that in Alex Janows, we found it “re-
markable” and improper for the prosecutor to tell the jury
that “beyond a reasonable doubt means just that. It does not
mean proof to a certainty or proof beyond all doubt.”
Id. at 723.
 The government’s comments here were substantially the
same as those in Alex Janows. “[W]e [again] admonish counsel,
do not deﬁne ‘reasonable doubt’ to a jury.” Id. Without more,
however, “we will not reverse because the error is harmless.”
Id. The evidence against Alt was overwhelming. Speciﬁcally,
the government presented the Grindr messages, in which Alt
repeatedly asked the boy for his address and discussed, in de-
tail, his plans to engage in sexual activity with the boy. Even
after the boy told Alt that he was only ﬁfteen years old, Alt
persisted in his plans. After ﬁnally providing his address, for
example, the boy told Alt, “Just don’t tell anyone I blew you
lol,” and Alt responded, “Agreed, and same goes with u. Just
between us.” Alt then traveled to what he believed to be the
boy’s address, in another city, and was arrested outside of
that residence. “There is no chance that a jury would have re-
solved this case diﬀerently” absent the prosecutor’s
No. 21-2724 15

comments. Id. Put diﬀerently, the prosecutor’s remarks in no
way deprived Alt of a fair trial. See Chavez, 12 F.4th at 728.
 Alt’s argument that jurors aﬀord statements from govern-
ment prosecutors substantial weight, rendering this error sig-
niﬁcant, is unpersuasive. Even if statements from the govern-
ment are impactful for a jury, statements from the presiding
judge carry even more weight. Compare United States v. Vargas,
583 F.2d 380, 386 (7th Cir. 1978) (“coming from the mouth of
the representative of the United States, the [prosecutor’s]
statements carry much weight ….”) (citation omitted), with
United States v. Harper, 662 F.3d 958, 961 (7th Cir. 2011) (“in-
structions from the court carry more weight with jurors than
do arguments made by attorneys.”) (citing Boyde v. California,
494 U.S. 370, 384 (1990)). And here, the district court immedi-
ately reminded the jury that, “I’ve not instructed you as to any
deﬁnition of ‘beyond a reasonable doubt’ or ‘reasonable
doubt,’ so that is for you to ultimately determine what you
believe to be reasonable doubt.” This additional instruction
cured any potential risk of prejudice. See United States v. Cor-
nett, 232 F.3d 570, 574 (7th Cir. 2000) (holding “whether the
trial court’s instructions to the jury were adequate to cure any
prejudice that might otherwise result from the improper com-
ments” is a relevant factor to assess prejudice due to prosecu-
tor’s comments); see also Harper, 662 F.3d at 961 (“we presume
that the [district] court’s proper instruction ensured that the
jury applied the correct standard.”). Alt also reiterated to the
jury that it was up to them to deﬁne the standard during his
own closing argument.
 While denying the objection to the prosecutor’s statements
was in error, the error was harmless and does not warrant re-
versal.
16 No. 21-2724

D. Conditions of Supervised Release
 Finally, Alt argues that the district court abused its discre-
tion by ordering sex oﬀender treatment as a condition of su-
pervised release. We review a district court’s decision to im-
pose a special condition of supervised release for abuse of dis-
cretion. United States v. Ross, 475 F.3d 871, 873 (7th Cir. 2007);
Gall v. United States, 552 U.S. 38, 46 (2007) (“[A]ppellate review
of sentencing decisions is limited to determining whether
they are ‘reasonable.’”).
 Alt argues that sex oﬀender treatment programs are only
necessary for repeat oﬀenders, which he is not. But nowhere
do the Sentencing Guidelines indicate that this condition
should only be imposed for repeat oﬀenders, and Alt pro-
vides no legal support for this argument. The Guidelines rec-
ommend imposing this condition for a defendant like Alt,
who was convicted of a sex oﬀense. U.S.S.G. § 5D1.3(d)(7).
Further, the district court noted the condition was necessary
to help protect the public given that Alt posed a risk to minors
and the community. See 18 U.S.C. § 3583(d)(1) (noting courts
may impose conditions of supervised release “reasonably re-
lated” to the § 3553(a) sentencing factors); § 3553(a)(2)(C)
(“The court shall impose a sentence suﬃcient, but not greater
than necessary, … to protect the public from further crimes of
the defendant.”). The district court did not abuse its discretion
by imposing this condition.
 III. Conclusion
 For the foregoing reasons, the rulings of the district court
are
 AFFIRMED
No. 21-2724 17

 KIRSCH, Circuit Judge, concurring. I join the majority opin-
ion but write separately on the issue of deﬁning the reasona-
ble doubt standard (part II.C.). Our circuit has a rigid rule,
which has developed over time, that strictly prohibits district
judges and the parties from ever deﬁning reasonable doubt
for a jury. We are the only circuit that aﬀords district judges
no discretion to deﬁne the phrase. In my view, we should join
the other circuits that trust district judges with the discretion
to deﬁne the phrase in the appropriate circumstances. We
should, however, counsel district judges against doing so as a
matter of course so as not to further confuse the meaning of
the phrase, particularly when it has not been put at issue in
the case.
 “[T]he Constitution neither prohibits trial courts from de-
fining reasonable doubt nor requires them to do so as a matter
of course.” Victor v. Nebraska, 511 U.S. 1, 5 (1994). But we have
made very clear that district judges and parties in our circuit
are prohibited from doing so. For instance, in United States v.
Glass, 846 F.2d 386, 387 (7th Cir. 1988), defense counsel at-
tempted to define reasonable doubt during closing argument.
The jury sought a more precise definition from the district
judge during its deliberations, but the judge refused to give
one, and the jury returned a guilty verdict. The defendant ap-
pealed, arguing that the trial court erred in refusing to define
reasonable doubt for the jury. We affirmed, holding that:
 It is … inappropriate for judges to give an in-
 struction deﬁning “reasonable doubt,” and it is
 equally inappropriate for trial counsel to pro-
 vide their own deﬁnition. See, e.g., United States
 v. Dominguez, 835 F.2d 694, 701 (7th Cir. 1987).
 Trial counsel may argue that the government
18 No. 21-2724

 has the burden of proving the defendant’s guilt
 “beyond a reasonable doubt,” but they may not
 attempt to deﬁne “reasonable doubt.” Thus, the
 court below should not have allowed Glass’s
 counsel to explain to the jury his understanding
 of “reasonable doubt.” And Glass’s counsel,
 who created this whole problem, should not
 have deﬁned it.
Id. (emphasis in original); see also, e.g., United States v. Hat-
ﬁeld, 591 F.3d 945, 949 (7th Cir. 2010) (“[S]ome courts, includ-
ing our own, tell district judges not to try to explain to a jury
the meaning of beyond a reasonable doubt.”); United States v.
Bruce, 109 F.3d 323, 329 (7th Cir. 1997) (“It is well established
in this Circuit, however, that neither trial courts nor counsel
should attempt to deﬁne ‘reasonable doubt’ for the jury.”);
United States v. Thompson, 117 F.3d 1033, 1035 (7th Cir. 1997)
(“The law is clear in this circuit that it is improper for attor-
neys to attempt to deﬁne the term.”); United States v. Hall, 854
F.2d 1036, 1039 (7th Cir. 1988) (“[N]o attempt should be made
to deﬁne reasonable doubt.”); Dominguez, 835 F.2d at 701 (“In
this circuit, instructions by counsel on the meaning of reason-
able doubt are improper … .”).
 Our rule has not always been so stringent. In the not too
distant past, we merely cautioned district courts against de-
fining reasonable doubt. See, e.g., United States v. Kramer, 711
F.2d 789, 795 (7th Cir. 1983) (“caution[ing]” judges not to de-
fine reasonable doubt); United States v. Martin-Trigona, 684
F.2d 485, 493 (7th Cir. 1982) (“advis[ing] against defining ‘rea-
sonable doubt’”); see also Seventh Circuit Pattern Criminal
Jury Instructions § 2.07 (1980) (recommending that no instruc-
tion be given defining ‘reasonable doubt’ but acknowledging
No. 21-2724 19

that “the Seventh Circuit has refused to adopt a per se rule
against defining reasonable doubt”); Seventh Circuit Manual
on Jury Instructions in Federal Criminal Cases § 6.01-3 (1963)
(providing a definition of reasonable doubt). But now, we di-
rect all district judges to follow Glass and abstain from ever
defining the term for a jury, without exception. Seventh Cir-
cuit Pattern Criminal Jury Instructions § 1.04, Committee
Comment (2022) (relying exclusively upon the Glass line of
cases to conclude “that it is inappropriate for the trial judge to
attempt to define ‘reasonable doubt’ for the jury”).
 Our rule stands alone. Although several circuits discour-
age district judges from deﬁning the phrase, all but ours give
district judges at least some discretion to do so. 1 Moreover,

 1 See, e.g., United States v. Herman, 848 F.3d 55, 57 (1st Cir. 2017) (hold-

ing that a district court “retains significant discretion in formulating” an
instruction defining reasonable doubt, so long as the instruction is accu-
rate); United States v. Shamsideen, 511 F.3d 340, 348 (2d Cir. 2008) (holding
that the district court did not err when it “clearly and accurately instructed
the jury on the reasonable doubt standard in some detail”); United States
v. Hoffecker, 530 F.3d 137, 174–75 (3d Cir. 2008) (holding that the district
court correctly defined reasonable doubt for the jury based on the Third
Circuit Pattern Criminal Jury Instructions § 3.06); United States v. Walton,
207 F.3d 694, 696, 699 (4th Cir. 2000) (en banc) (discouraging definition of
the reasonable doubt standard but allowing a trial judge to define it “if the
jury requests a definition”); United States v. Williams, 20 F.3d 125, 128, n.1
(5th Cir. 1994) (rejecting our approach and noting that the Fifth Circuit has
“encouraged” district courts “to use [the Fifth] Circuit’s Pattern Jury In-
struction on the definition of reasonable doubt”); United States v. Ashraf-
khan, 964 F.3d 574, 578 (6th Cir. 2020) (“[I]f a court chooses to define the
[reasonable doubt] standard, [then it must] make[ ] clear to the jury that
the burden of proof is high.”); United States v. Harris, 974 F.2d 84, 85–86
(8th Cir. 1992) (instruction defining reasonable doubt is proper when it
provides “a correct statement of the law”); United States v. Nolasco, 926 F.2d
20 No. 21-2724

most circuits have pattern jury instructions deﬁning the
phrase. 2 The Eighth Circuit even imposes an aﬃrmative duty
on district courts to instruct juries on the meaning of reason-
able doubt. See Eighth Circuit Pattern Criminal Jury Instruc-
tions § 3.11, Committee Comments (2021) (citing Friedman v.
United States, 381 F.2d 155 (8th Cir. 1967)).
 Still, the Supreme Court and several circuits have cau-
tioned that eﬀorts to deﬁne the phrase may “result in further
obfuscation of the concept[.]” United States v. Olmstead, 832
F.2d 642, 645 (1st Cir. 1987); see also, e.g., Holland v. United
States, 348 U.S. 121, 140 (1954) (citation omitted) (“Attempts to
explain the term ‘reasonable doubt’ do not usually result in
making it any clearer to the minds of the jury … .”). But that
is not the same as curtailing altogether the district court’s

869, 872 (9th Cir. 1991) (en banc) (holding that “an appropriate instruction
defining reasonable doubt is permissible but not necessarily required”);
United States v. Petty, 856 F.3d 1306, 1309 (10th Cir. 2017) (district courts
retain “considerable latitude in instructing juries on reasonable doubt” so
long as instruction accurately conveys concept); Johnson v. Alabama, 256
F.3d 1156, 1191 (11th Cir. 2001) (“If a trial court does attempt to define
reasonable doubt, it must explain the standard correctly[.]”); United States
v. Mejia, 597 F.3d 1329, 1340 (D.C. Cir. 2010) (rejecting challenge to jury
instruction defining reasonable doubt when defendant “offer[ed] no rea-
son why the Constitution would apply differently simply because he pre-
ferred no instruction”).
 2 See, e.g., Third Circuit Pattern Criminal Jury Instructions § 3.06

(2021); Fifth Circuit Pattern Criminal Jury Instructions § 1.05 (2019); Sixth
Circuit Pattern Criminal Jury Instructions § 1.03 (2022); Eighth Circuit Pat-
tern Criminal Jury Instructions § 3.11 (2021); Ninth Circuit Pattern Crimi-
nal Jury Instructions § 6.5 (2022); Tenth Circuit Pattern Criminal Jury In-
structions § 1.05 (2021); Eleventh Circuit Pattern Criminal Jury Instruc-
tions § BI B3 (2020). I am confident that our circuit’s pattern instruction
committee can likewise craft an appropriate instruction.
No. 21-2724 21

discretion to ever provide a deﬁnition, and the Supreme
Court has “never held that the concept of reasonable doubt is
undeﬁnable[.]” Victor, 511 U.S. at 26 (Ginsburg, J., concurring
in part and concurring in the judgment).
 In my view, while district courts need not deﬁne the term
for the jury as a matter of course (particularly where the
meaning of the phrase has not been put at issue), I am not
convinced that there will never be a case in our circuit where
the jury will not beneﬁt from an instruction deﬁning this sem-
inal phrase.
 This is a case in point. Here is the full exchange on this
issue that took place in front of the jury during the govern-
ment’s closing argument:
 PROSECUTOR: … keep in mind the govern-
 ment’s burden; it is beyond a reasonable doubt.
 It is not beyond all doubt. It is not beyond any
 shadow of a doubt.
 DEFENSE COUNSEL: I’m going to object to de-
 ﬁning a “reasonable doubt.” The jurors can do
 that for themselves.
 COURT: [Prosecutor], your response?
 PROSECUTOR: My response is that I’m not de-
 ﬁning it so much as explaining that [sic] what it
 is not.
 COURT: I don’t think at this point [prosecutor]
 has gone out of bound here, so I’ll allow it go
 ahead.
 PROSECUTOR: The only thing I’ll add to that is
 any doubt you have --
22 No. 21-2724

 COURT: Let met interject one thing though.
 PROSECUTOR: Yes, sir.
 COURT: I’ve not instructed you as to any deﬁ-
 nition of “beyond a reasonable doubt” or “rea-
 sonable doubt,” so that is for you to ultimately
 determine what you believe to be reasonable
 doubt. Go ahead, [defense counsel].
 DEFENSE COUNSEL: Judge, I still believe that
 it’s improper argument. There’s a reason that’s
 not deﬁned.
 COURT: I understand, but he’s moving on. Go
 ahead, [prosecutor].
 After the prosecutor deﬁned reasonable doubt for the jury,
to me it would have been better for the district judge to simply
have included an instruction to the jury—after the lawyers’
arguments concluded—along these lines:
 [T]he government has the burden of proving the
 defendant guilty beyond a reasonable doubt.
 Some of you may have served as jurors in civil
 cases, where you were told that it is only neces-
 sary to prove that a fact is more likely true than
 not true. In criminal cases, the government’s
 proof must be more powerful than that. It must
 be beyond a reasonable doubt.
 Proof beyond a reasonable doubt is proof that
 leaves you ﬁrmly convinced of the defendant’s
 guilt. There are very few things in this world
 that we know with absolute certainty, and in
 criminal cases the law does not require proof
No. 21-2724 23

 that overcomes every possible doubt. If, based
 on your consideration of the evidence, you are
 ﬁrmly convinced that the defendant is guilty of
 the crime charged, you must ﬁnd him guilty. If
 on the other hand, you think there is a real pos-
 sibility that he is not guilty, you must give him
 the beneﬁt of the doubt and ﬁnd him not guilty.
Federal Judicial Center Pattern Criminal Jury Instructions § 21
(1988). This “clear, straightforward, and accurate” deﬁnition
of reasonable doubt “plainly informs the jurors that the pros-
ecution must prove its case by more than a mere preponder-
ance of the evidence, yet not necessarily to an absolute cer-
tainty.” Victor, 511 U.S. at 26–27 (Ginsburg, J., concurring).
This instruction would have been better—for both the jury
and the parties—after the government had put the deﬁnition
at issue. Instead, the district judge followed our precedent
and left it completely to the jurors to determine what they be-
lieved reasonable doubt meant. At least to me, that route
seems much more likely to lead to confusion among jurors
than providing them with an accurate deﬁnition of reasonable
doubt.
 All the other circuits give district judges at least some dis-
cretion to deﬁne reasonable doubt depending on the unique
circumstances of the case, and most provide them with lan-
guage accurately conveying the concept. We should too.